No. 24-10743

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

WILLIAM T. MOCK; CHRISTOPHER LEWIS; FIREARMS POLICY COALITION,
INCORPORATED, a nonprofit corporation; MAXIM DEFENSE INDUSTRIES, L.L.C.,

Plaintiffs-Appellees,

v.

MERRICK GARLAND, in his official capacity as Attorney General of the United States;
UNITED STATES DEPARTMENT OF JUSTICE; BUREAU OF ALCOHOL, TOBACCO,
FIREARMS, AND EXPLOSIVES; STEVEN DETTELBACH, in his official capacity as the
Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives,

Defendants-Appellants.

On Appeal from the United States District Court
for the Northern District of Texas

# OPENING BRIEF FOR APPELLANTS

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney
  General*
LEIGHA SIMONTON
  *United States Attorney*
ABBY C. WRIGHT
SEAN R. JANDA
BEN LEWIS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7250*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-2494*

## CERTIFICATE OF INTERESTED PERSONS

A certificate of interested persons is not required, as defendants-appellants are all governmental parties. 5th Cir. R. 28.2.1.

## STATEMENT REGARDING ORAL ARGUMENT

The district court universally vacated a Rule issued by the Bureau of Alcohol, Tobacco, Firearms, and Explosives. The Rule interprets the National Firearms Act (NFA), clarifies that the NFA's important public-safety taxation scheme applies to short-barreled rifles constructed from so-called "stabilizing braces," and provides guidance for determining whether any particular braced firearm is a short-barreled rifle. Given the public safety and regulatory clarity goals furthered by the challenged Rule, the government respectfully requests that the Court hold oral argument in this appeal.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS ............................................................ i

STATEMENT REGARDING ORAL ARGUMENT ................................................... ii

TABLE OF CONTENTS ....................................................................................... iii

INTRODUCTION ................................................................................................. 1

STATEMENT OF JURISDICTION ....................................................................... 3

STATEMENT OF THE ISSUES ............................................................................ 3

STATEMENT OF THE CASE .............................................................................. 4

      A.    Legal Background ................................................................................ 4

      B.    Procedural History ............................................................................ 10

SUMMARY OF ARGUMENT ............................................................................ 14

STANDARD OF REVIEW ................................................................................. 17

ARGUMENT ..................................................................................................... 17

I.    The District Court Erred in Granting Summary Judgment to Plaintiffs .......... 17

      A.    The Government Is Entitled to Judgment on Plaintiffs' Logical-
           Outgrowth Claim ................................................................................ 17

           1.    The Rule Is Interpretive ................................................................ 18

           2.    The Rule Is a Logical Outgrowth of the Proposal ........................ 25

           3.    Plaintiffs Have Not Demonstrated Prejudice from Any
               Notice Error ................................................................................ 31

      B.    The Rule Is Not Arbitrary and Capricious ................................................. 33

II.   The District Court Erred in Universally Vacating the Rule ................................ 39

A.   The Tax Anti-Injunction Act Precluded the District Court's Vacatur of the Rule as Used to Determine Tax Liability ......................... 40

B.   The District Court Erred in Providing Relief to Non-Plaintiffs, Including Unidentified Members of the Organizational Plaintiff .......... 43

    1.   The District Court Improperly Failed to Consider Whether the Balance of Equities and the Public Interest Justified Its Universal Remedies ........................................................................ 44

    2.   Constitutional and Equitable Principles Precluded the District Court's Universal Vacatur in This Case ........................... 47

CONCLUSION ............................................................................................... 53

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Aberdeen & Rockfish R.R. v. Students Challenging Regulatory Agency Procedures* (S.C.R.A.P.),
    422 U.S. 289 (1975) ............................................................ 43

*American Mining Cong. v. Mine Safety & Health Admin.*,
    995 F.2d 1106 (D.C. Cir. 1993) .......................................... 20

*American Tort Reform Ass'n v. Occupational Safety & Health Admin.*,
    738 F.3d 387 (D.C. Cir. 2013) ............................................ 23

*Arizona v. Biden*,
    40 F.4th 375 (6th Cir. 2022) .......................................... 47, 51

*Bezet v. United States*,
    276 F. Supp. 3d 576 (E.D. La.), *aff'd*,
    714 F. App'x 336 (5th Cir. 2017) ........................................ 4

*Bob Jones Univ. v. Simon*,
    416 U.S. 725 (1974) .................................................... 40, 41

*British Caledonian Airways, Ltd. v. C.A.B.*,
    584 F.2d 982 (D.C. Cir. 1978) ............................................ 24

*Califano v. Yamasaki*,
    442 U.S. 682 (1979) ...................................................... 48

*Cargill v. Garland*,
    57 F.4th 447 (5th Cir. 2023) ............................................. 46

*Catawba County v. EPA*,
    571 F.3d 20 (D.C. Cir. 2009) ............................................. 37

*Chemical Mfrs. Ass'n v. EPA*,
    870 F.2d 177 (5th Cir. 1989) ............................................. 25

*City of Arlington v. FCC*,
    668 F.3d 229 (5th Cir. 2012), *aff'd*,
    569 U.S. 290 (2013) .................................................... 31, 32

*City of Idaho Falls, Idaho v. FERC*,
    629 F.3d 222 (D.C. Cir. 2011) ............................................ 23

*City of Waukesha v. EPA*,
    320 F.3d 228 (D.C. Cir. 2003) ............................................ 32

*Direct Mktg. Ass'n v. Brohl,*
    575 U.S. 1 (2015) .................................................................... 42

*Encino Motorcars, LLC v. Navarro,*
    579 U.S. 211 (2016) ................................................................ 36

*FCC v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2009) ................................................................ 36

*FCC v. Prometheus Radio Project,*
    592 U.S. 414 (2021) ................................................................ 33

*Flora v. United States,*
    357 U.S. 63 (1958) .................................................................. 40

*Flytenow, Inc. v. FAA,*
    808 F.3d 882 (D.C. Cir. 2015) ............................................... 20

*Franciscan All., Inc. v. Becerra,*
    47 F.4th 368 (5th Cir. 2022) ................................................... 44

*Friends of the Earth, Inc. v. Chevron Chem. Co.,*
    129 F.3d 826 (5th Cir. 1997) .................................................. 50

*FTI v. FAA,*
    58 F.4th 230 (5th Cir. 2023) ................................................... 18

*Garland v. Aleman Gonzalez,*
    596 U.S. 543 (2022) ................................................................ 42

*Gill v. Whitford,*
    585 U.S. 48 (2018) .................................................................. 48

*Guedes v. ATF,*
    920 F.3d 1 (D.C. Cir. 2019) .............................................. 21, 22

*Handley v. Chapman,*
    587 F.3d 273 (5th Cir. 2009) .................................................. 33

*Health Ins. Ass'n of Am. v. Shalala,*
    23 F.3d 412 (D.C. Cir. 1994) ................................................. 23

*Hecht Co. v. Bowles,*
    321 U.S. 321 (1944) ................................................................ 45

*Holder v. Humanitarian Law Project,*
  561 U.S. 1 (2010) ............................................................... 37, 39

*Hotze v. Burwell,*
  784 F.3d 984 (5th Cir. 2015) ........................................... 40

*Huawei Techs. USA, Inc. v. FCC,*
  2 F.4th 421 (5th Cir. 2021) ......................... 25, 26, 28, 29, 30

*MediNatura, Inc. v. FDA,*
  998 F.3d 931 (D.C. Cir. 2021) ......................................... 52

*Mendoza v. Perez,*
  754 F.3d 1002 (D.C. Cir. 2014) ...................................... 18

*Mid Continent Nail Corp. v. United States,*
  846 F.3d 1364 (Fed. Cir. 2017) ....................................... 32

*Mock v. Garland,*
  75 F.4th 563 (5th Cir. 2023) ..................... 10, 11, 12, 17, 20, 21, 22, 24, 28, 29, 32

*National Fed'n of the Blind of Tex., Inc. v. Abbott,*
  647 F.3d 202 (5th Cir. 2011) .......................................... 17

*National Mining Ass'n v. McCarthy,*
  758 F.3d 243 (D.C. Cir. 2014) ........................................ 23

*National Park Hosp. Ass'n v. Department of Interior,*
  538 U.S. 803 (2003) ....................................................... 23

*Northstar Wireless, LLC v. FCC,*
  38 F.4th 190 (D.C. Cir. 2022) ........................................ 38

*Perez v. Mortgage Bankers Ass'n,*
  575 U.S. 92 (2015) ......................................................... 18

*POET Biorefining, LLC v. EPA,*
  970 F.3d 392 (D.C. Cir. 2020) ........................................ 19

*Starbucks Corp. v. McKinney,*
  144 S. Ct. 1570 (2024) ................................................... 45

*Taylor, In re,*
  655 F.3d 274 (3d Cir. 2011) ........................................... 49

*Texas Democratic Party v. Abbott*,
   961 F.3d 389 (5th Cir. 2020) ................................................. 37

*Texas v. EPA*,
   983 F.3d 826 (5th Cir. 2020) ................................................. 38

*Texas v. Lyng*,
   868 F.2d 795 (5th Cir. 1989) ............................................. 31, 32

*Texas v. United States*,
   50 F.4th 498 (5th Cir. 2022) ................................................. 49

*Tompkins v. Cyr*,
   202 F.3d 770 (5th Cir. 2000) ................................................. 49

*United States v. Clintwood Elkhorn Mining Co.*,
   553 U.S. 1 (2008) ................................................................. 40

*United States v. Freed*,
   401 U.S. 601 (1971) .............................................................. 4

*United States v. Gresham*,
   118 F.3d 258 (5th Cir. 1997) ................................................... 5

*United States v. Johnson*,
   632 F.3d 912 (5th Cir. 2011) ............................................. 31, 32

*United States v. Kates*,
   174 F.3d 580 (5th Cir. 1999) ................................................. 38

*United States v. Reynolds*,
   710 F.3d 498 (3d Cir. 2013) ................................................. 32

*United States v. Texas*,
   599 U.S. 670 (2023) ................................................... 44, 46, 47

*United States v. Thompson/Center Arms Co.*,
   504 U.S. 505 (1992) .............................................................. 4

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
   455 U.S. 489 (1982) ......................................................... 37, 39

*Warshauer v. Solis*,
   577 F.3d 1330 (11th Cir. 2009) ............................................. 18

*Watterson v. ATF,*
  No. 23-40556, 2024 WL 3935446 (5th Cir. Aug. 26, 2024) ...................................... 13

**Statutes:**

Administrative Procedure Act (APA):
  5 U.S.C. § 702(1) ................................................................................ 46, 47
  5 U.S.C. § 703 ........................................................................................ 44
  5 U.S.C. § 706 ........................................................................................ 32

National Firearms Act:
  26 U.S.C. § 5801 *et seq.* .......................................................................... 4
  26 U.S.C. § 5801 ...................................................................................... 4
  26 U.S.C. § 5811 ...................................................................................... 5
  26 U.S.C. §§ 5811-5812 ............................................................................ 5
  26 U.S.C. § 5821 .................................................................................. 4-5
  26 U.S.C. §§ 5821-5822 ............................................................................ 5
  26 U.S.C. § 5822 ...................................................................................... 5
  26 U.S.C. § 5841 ...................................................................................... 5
  26 U.S.C. § 5845 ...................................................................................... 1
  26 U.S.C. § 5845(a)(3) ............................................................................. 6
  26 U.S.C. § 5845(c) ........................................................................ 6, 18, 38

26 U.S.C. § 6511 .................................................................................. 5, 41

26 U.S.C. § 7421(a) ................................................................. 13, 15, 39, 40, 42

26 U.S.C. § 7422 .................................................................................. 6, 41

26 U.S.C. § 7801 ...................................................................................... 6

26 U.S.C. § 6532(a)(1) ............................................................................ 41

28 U.S.C. § 1291 ...................................................................................... 3

28 U.S.C. § 1331 ...................................................................................... 3

28 U.S.C. § 2201(a) ................................................................................ 40

**Regulations:**

27 C.F.R § 478.11 ............................................................................... 18, 24

27 C.F.R. § 479.11 ............................................................................. 18

27 C.F.R. § 479.64 ............................................................................... 5

**Rule:**

Fed. R. App. P. 4(a)(1)(B) ................................................................... 3

**Legislative Material:**

H.R. Rep. No. 73-1780 (1934) ............................................................ 4

H.R. Rep. No. 83-1337 (1954) ...................................................... 4, 52

**Other Authorities:**

ATF, Rev. Rul. 61-45, 1961-1 C.B. 663 ............................................ 6

ATF, Rev. Rul. 61-203, 1961-2 C.B. 224 .......................................... 6

Factoring Criteria for Firearms with Attached "Stabilizing Braces,"
   88 Fed. Reg. 6478 (Jan. 31, 2023) ...................... 1, 2, 6, 7, 8, 9, 10, 18, 19, 20, 22, 23,
                            24, 26, 27, 29, 30, 34, 35, 36, 39, 52

86 Fed. Reg. 30,826 (June 10, 2021) ........................................... 25, 26, 27, 30

*Prejudice*, Black's Law Dictionary (12th ed. 2024) ....................................... 32

*Restrain*, Black's Law Dictionary (6th ed. 1990) .............................................. 42

**INTRODUCTION**

For almost a century, Congress has regulated short-barreled rifles under the National Firearms Act (NFA) as particularly dangerous weapons. A short-barreled rifle is a "rifle"—that is, a firearm "designed," "made," and "intended" to be "fired from the shoulder"—with a barrel shorter than 16 inches. 26 U.S.C. § 5845. A typical short-barreled rifle is shown below:



*See* Factoring Criteria for Firearms with Attached "Stabilizing Braces," 88 Fed. Reg. 6478, 6525 (Jan. 31, 2023) (Rule). Such a firearm is designed for the shooter to press the "stock"—the rearward piece—against his or her shoulder when firing.

Recently, some manufacturers have sold firearms with short barrels and rearward attachments marketed as "stabilizing braces." These manufacturers claim that those firearms are not rifles because they are not designed to be fired from the shoulder. Instead—these manufacturers claim—the stabilizing brace is designed to rest against or wrap around a shooter's forearm to assist with one-handed firing. Many braced weapons, however, are indistinguishable from those with stocks:



*See* ROA.1216; 88 Fed. Reg. at 6494 (top item equipped with "brace" and bottom equipped with traditional stock). Such weapons should therefore be sold in compliance with the NFA.

In response to this evasion of federal law—and resulting confusion among the public—the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) issued a rule explaining when a weapon is a short-barreled rifle within the meaning of the NFA. The Rule explains that the agency had previously issued individual determinations evaluating whether particular braced firearms constituted short-barreled rifles—with many, though not all, classified as short-barreled rifles—but that those classifications were not consistent and sometimes gave undue weight to the manufacturer's stated intent. The Rule therefore clarifies that whether a braced weapon is designed and intended to be fired from the shoulder does not turn solely on the manufacturer's claimed intent; instead, the standard also focuses on the weapon's objective design features and other evidence. The Rule then sets forth the evidence that ATF will consider when determining whether any particular firearm equipped with a brace is designed and intended to be shoulder-fired.

The Rule has been the subject of much litigation in this circuit, and others. In 2023, this Court reversed the district court's denial of a preliminary injunction, holding that plaintiffs were likely to succeed on the merits of their procedural claim. On remand, the district court entered a nationwide vacatur of the Rule, concluding that it was not issued through proper notice-and-comment procedures and that it is arbitrary and capricious. That decision was erroneous. And the district court compounded its error by entering nationwide relief, despite both equitable principles and the Tax Anti-Injunction Act prohibiting such a sweeping remedy in this case. This Court should reverse.

## STATEMENT OF JURISDICTION

The district court entered final judgment on June 13, 2024. *See* ROA.1959. The government filed a timely notice of appeal from that final judgment on August 12, 2024. *See* ROA.1968; *see also* Fed. R. App. P. 4(a)(1)(B) (providing that a notice of appeal must be filed within 60 days after entry of judgment in a suit involving the federal government). The district court had jurisdiction over the case under 28 U.S.C. § 1331, and this Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

The district court universally vacated the Rule on the grounds that the Rule is a legislative rule that was not properly a logical outgrowth of the proposed rule and that the Rule is arbitrary and capricious. The issues presented are the following:

1. Whether plaintiffs are entitled to relief on their logical outgrowth claim;

2. Whether the Rule is arbitrary and capricious; and

3. Whether the district court's universal vacatur was impermissibly overbroad.

## STATEMENT OF THE CASE

### A.    Legal Background

**1.** The National Firearms Act, 26 U.S.C. § 5801 *et seq.*, regulates "dangerous weapons," H.R. Rep. No. 73-1780, at 1 (1934), that can "be used readily and efficiently by criminals or gangsters," H.R. Rep. No. 83-1337, at A395 (1954). These firearms include powerful "concealable weapon[s]," *United States v. Thompson/Center Arms Co.*, 504 U.S. 505, 517 (1992) (plurality opinion), like short-barreled shotguns and, as relevant here, short-barreled rifles. *See* H.R. Rep. No. 90-1956, at 34 (1968) (Conf. Rep.).

For those firearms, the NFA establishes a taxation-and-registration scheme "in the interest of the public safety." *United States v. Freed*, 401 U.S. 601, 609 (1971). This scheme tracks "the flow of [NFA] firearms" to ensure they stay away from criminal, dangerous, or irresponsible individuals. *Bezet v. United States*, 276 F. Supp. 3d 576, 612 (E.D. La.), *aff'd*, 714 F. App'x 336 (5th Cir. 2017). Importers, manufacturers, and dealers in covered firearms, including short-barreled rifles, must pay an annual special occupational tax of $1000 or $500. *See* 26 U.S.C. § 5801. In addition, individuals who are not engaged in a firearms business but who wish to make an NFA-regulated firearm, including a short-barreled rifle, must pay a $200 tax per firearm made. *See id.*

4

§ 5821. Finally, any entity or individual who wishes to transfer an NFA firearm is required to pay a $200 tax for each firearm transferred. *See id.* § 5811.

In addition, "[i]n order to facilitate enforcement" of the NFA's tax, the statute imposes registration and approval requirements. *United States v. Gresham*, 118 F.3d 258, 261 (5th Cir. 1997). Thus, individuals who are not engaged in a firearms business but who wish to make an NFA-regulated firearm must obtain prior approval. *See* 26 U.S.C. §§ 5821-5822. To that end, the individual must file a written application with ATF that includes identifying information about "the firearm to be made" as well as identifying information, including fingerprints and a photograph, about the maker. *Id.* § 5822. Once the application is filed and the tax is paid, ATF may approve the application. *See id.* "Upon receipt of the approved application, the maker is authorized to make the firearm described therein." 27 C.F.R. § 479.64.

Moreover, both a qualified manufacturer and an individual who has his application to make a firearm approved must register each firearm made. *See* 26 U.S.C. § 5841. And to transfer a covered firearm, a transferor must go through a similar process to obtain prior approval—identifying a transferee, registering the firearm to the new owner, and paying a $200 tax. *See id.* §§ 5811-5812.

If the maker of a firearm wishes to challenge the assessment of the NFA's tax against him, the Internal Revenue Code provides a mechanism to do so. The maker may file a claim for a refund or credit with the Attorney General. *See* 26 U.S.C. § 6511.

If the maker is dissatisfied with the result of that administrative process, she may bring suit in district court in a civil action for a refund of the tax. *See id.* § 7422.

**2.** ATF is responsible for enforcing the NFA. *See* 26 U.S.C. § 7801. ATF must therefore determine which firearms constitute "short-barreled rifles." Under the NFA, a "rifle" is a firearm that is "designed or redesigned, made or remade, and intended to be fired from the shoulder." *Id.* § 5845(c). A rifle with a barrel under 16 inches is a short-barreled rifle subject to the NFA's requirements. *Id.* § 5845(a)(3).

As shown in the previous images, *see supra* pp. 1-2, a short-barreled rifle has, at the front end, a receiver and a short barrel. At the back, it has a "stock," "butt stock," or "shoulder stock," which is pressed against the shoulder when firing. 88 Fed. Reg. at 6522. It has long been the case that the stock, like many firearm components, is often detachable or sold separately. *See, e.g.*, ATF, Rev. Rul. 61-45, 1961-1 C.B. 663; ATF, Rev. Rul. 61-203, 1961-2 C.B. 224.

Over the last decade, ATF has received an increasing number of requests to determine whether short-barreled firearms equipped with so-called "stabilizing brace[s]"—rather than stocks—constitute "rifles." *See* 88 Fed. Reg. at 6482-84. These braces are also rearward attachments, but they have features—such as an opening or straps—that may be used to fasten the firearm against the forearm. *See, e.g., id.* at 6483. Manufacturers have claimed that braced firearms are not designed to be fired from the shoulder but, instead, that the brace is designed to "assist people with disabilities or limited strength or mobility with firing heavy pistols" with one hand. *Id.* at 6482.

6

In many cases, however, firearms with stabilizing braces appear nearly identical to those with stocks:



*See* 88 Fed. Reg. at 6527-29 (left item equipped with stock; right items with brace). And as shown in marketing materials and trade magazines, many firearms equipped with braces are designed to be shouldered in the same way as firearms with stocks.



*See id.* at 6527, 6546 (both "arm braces"; gun publication on left; trade magazine on right).

Between 2012 and 2020, ATF reviewed various braced weapons for classification under the NFA, assessing whether each firearm was designed and intended to be fired from the shoulder. ATF made clear that designing a "stabilizing brace for use as a shoulder stock" or "configur[ing] the [brace] device for use as a

shoulder-stock" may yield a short-barreled rifle, and ATF classified "the majority" of submitted samples as short-barreled rifles. 88 Fed. Reg. at 6482, 6487, 6492 (quotation omitted). But these classifications, which applied "only to the particular sample[s]" submitted, were not always consistent, either in their methodologies or in their conclusions. *Id.* at 6482, 6484 n.26; *see id.* at 6479 n.9 (collecting examples). The agency's analysis sometimes improperly focused on "whether the 'stabilizing brace' at issue could be used as a 'brace' to support single-handed fire rather than whether the overall configuration of the firearm with the attached 'brace' is designed and intended to be fired from the shoulder." *Id.* at 6501-02. And ATF sometimes "plac[ed] improper weight on the manufacturer's stated intent," *id.* at 6502, even when that stated intent was inconsistent with "the objective design features" of the firearm or how the firearm was "being used in the general community," *id.* at 6479. By 2020, ATF concluded that its case-by-case "classification determinations had led to confusion" and there was "a need to provide clarity to the firearm industry and public on how ATF evaluates firearms equipped with a 'stabilizing brace.'" *Id.* at 6494.

**3.** To provide that clarity, the agency issued the Rule, which "inform[s] the public of the best interpretation" of how to apply the NFA's design-and-intent standard to firearms equipped with a "stabilizing brace." 88 Fed. Reg. at 6502. The Rule primarily reiterates that in determining whether such firearms are "rifles"—that is, whether they are designed and intended to be fired from the shoulder—the manufacturer's "stated intent will not necessarily be dispositive." *Id.* at 6479. Instead,

8

the agency will consider whether other relevant evidence, such as the firearm's "objective design features," marketing materials, and the "likely use of the weapon" in the general community, "support[s] or undermine[s] that intent." *Id.*

More specifically, the Rule states that the statutory definition of "rifle" encompasses a firearm equipped with a stabilizing brace "that provides surface area that allows the weapon to be fired from the shoulder, provided that other" evidence "indicate[s] that the weapon is designed, made, and intended to be fired from the shoulder." 88 Fed. Reg. at 6569. The Rule then identifies evidence that ATF believes will generally be probative in determining whether any particular firearm is designed and intended to be shoulder-fired. That evidence includes objective design features: whether the weapon has a "weight or length" and a "length of pull" similar to that of similar model rifles; whether it is equipped with "sights or a scope" that require shouldering to use; and whether the surface area that allows the weapon to be fired from the shoulder is created by a "rearward attachment that is necessary for the cycle of operations." *Id.* It also includes the "manufacturer's direct and indirect marketing and promotional materials indicating the intended use of the weapon" and information showing "the likely use of the weapon in the general community." *Id.* at 6570.

The Rule estimates that at least "a majority" of existing firearms equipped with braces are likely to be classified as "rifles" or "short-barreled rifles" configured to be fired from the shoulder. 88 Fed. Reg. at 6480. But the Rule also makes clear that it is

possible to design a braced weapon that is not a rifle. For example, a braced weapon might not have "a surface area that allows shouldering"—as with "an elastic strap that wraps around the shooter's wrist." *Id.* at 6529-30. Or it might have "a feature intended specifically to prevent shooting the firearm from the shoulder," such as "a permanently attached protrusion" that would prevent comfortable shouldering. *Id.* at 6530.

Finally, the Rule also provides compliance options for individuals who possess unregistered brace-equipped short-barreled rifles. The Rule explains that the Department had decided to exercise its enforcement discretion to permit registration of such rifles by May 31, 2023, without penalty or tax. 88 Fed. Reg. at 6480-81.

## B. Procedural History

**1.** Plaintiffs—a firearms manufacturer and retailer, two individuals who possess firearms equipped with braces, and an advocacy organization—filed suit. *See* ROA.25-27. They claimed that the Rule was invalid on a number of different grounds.

In March 2023, the district court denied plaintiffs' motion for a preliminary injunction, concluding that plaintiffs were unlikely to succeed on the merits of any claim. *See* ROA.443. Plaintiffs appealed that denial, and this Court reversed. The Court concluded that plaintiffs were likely to succeed on their claim that the Rule violated the Administrative Procedure Act's (APA) notice-and-comment procedures under the logical-outgrowth doctrine. *See Mock v. Garland*, 75 F.4th 563, 567 (5th Cir. 2023). The Court first concluded that the rule was a legislative rule. *See id.* at 578-83.

Having determined that the rule was legislative, the Court held that the agency did not comply with notice-and-comment requirements because the final rule was not a logical outgrowth of the proposed rule. *See id.* at 583-86. The Court therefore reversed the denial of the preliminary injunction and remanded for the district court to consider the remaining preliminary-injunction factors, including the scope of any injunction. *See id.* at 586-88.

**2.** On remand, plaintiffs again requested a preliminary injunction, and the district court granted their motion. First, the court explained that this Court's decision established that plaintiffs had demonstrated a likelihood of success on the merits of their logical-outgrowth claim. *See* ROA.966. Second, the court concluded that plaintiffs had established the equitable factors required to support preliminary relief. *See* ROA.966-91. The district court thus granted plaintiffs a preliminary injunction, but the court declined to "extend the scope of the injunctive relief 'nationwide.'" ROA.993. Instead, the court limited its injunction to enforcement of the Rule against the individual plaintiffs (and their family members); the business plaintiff (and its customers); and the advocacy organization "and all of its members." ROA.993-94.

The government appealed. *See Mock v. Garland*, No. 23-11199 (5th Cir. dismissed Aug. 26, 2024). That appeal was ultimately consolidated with five other appeals from the grant or denial of preliminary relief against the Rule. *See Second Amendment Found. v. ATF*, No. 23-11157 (5th Cir.); *Britto v. ATF*, No. 23-11203 (5th

Cir.); *Texas Gun Rights, Inc. v. ATF*, No. 23-11204 (5th Cir.); *Texas v. ATF*, No. 23-40685 (5th Cir.); *Watterson v. ATF*, No. 23-40556 (5th Cir.).

**3.** On June 13, the district court granted summary judgment to plaintiffs on two of their claims and vacated the Rule universally. *See* ROA.1947-58. The court declined to address plaintiffs' remaining claims. *See* ROA.1956.

On the merits, the district court first held, relying entirely on this Court's decision in *Mock*, that the Rule is a legislative rule that was not a logical outgrowth of the proposed rule. *See* ROA.1951-52. Although this Court's opinion was at the preliminary injunction stage and only held plaintiffs' likely to succeed on that claim, the district court "decline[d]" the government's "invitation to" consider the claim with the benefit of new and full briefing, instead simply adopting the *Mock* majority opinion's "conclusion as its own." ROA.1951-52.

The district court also granted summary judgment to plaintiffs on their claim that the Rule is arbitrary and capricious, in two ways. First, the court held that the Rule "inexplicably and fundamentally switched [ATF's] position" on how to classify braced firearms "without providing sufficient explanations." ROA.1953-55. Second, the court held, in a single paragraph, that the Rule's approach of a qualitative balancing test is "impermissibly vague" and does not provide any "meaningful clarity about what constitutes an impermissible stabilizing brace." ROA.1955-56 (quoting *Mock*, 75 F.4th at 585).

The district court then determined that the appropriate remedy was to vacate the Rule universally. As an initial matter, the district court held that the Tax Anti-Injunction Act, which generally prohibits maintaining any suit "for the purpose of restraining the assessment or collection of any tax," 26 U.S.C. § 7421(a), was not implicated by plaintiffs' request for vacatur of the Rule, even as applied to ATF's collection of taxes. *See* ROA.1951. The court then stated its belief that vacatur, which it described as the default remedy for APA violations, was appropriate because the court concluded that the Rule had violated the APA's procedural requirements. ROA.1958. And even though the court had previously concluded that tailored relief was sufficient to redress plaintiffs' own asserted injuries, the court rejected the government's argument that any relief, including vacatur, should be limited to the plaintiffs. The court stated that "applying the vacatur" only to plaintiffs would be "more akin to an injunction" than to the "less drastic remedy" of vacatur. ROA.1958 (quotation omitted).

This appeal followed.[1]

---

[1] After the entry of final judgment in this case, the Court dismissed the various consolidated preliminary injunction appeals as moot, given the district court's vacatur of the Rule. *See Watterson v. ATF*, No. 23-40556, 2024 WL 3935446 (5th Cir. Aug. 26, 2024) (per curiam).

## SUMMARY OF ARGUMENT

**I.** The district court erred in granting summary judgment to plaintiffs on their claims that the Rule failed to comport with the APA's notice-and-comment provisions and the APA's reasoned decisionmaking requirements.

**A.** The district court erred in entering relief on plaintiffs' claim that the rulemaking process provided insufficient notice. Although this Court held at the preliminary injunction stage of this case that plaintiffs were likely to succeed on their logical-outgrowth claim, that analysis was preliminary. Closer consideration of the text and function of the Rule makes clear that it is an interpretive Rule. And, in any event, the notice of proposed rulemaking (NPRM) provided sufficient notice to permit interested parties to comment. Although the Rule heeded commenters' concerns by declining to adopt the NPRM's specific proposal, the NPRM previewed the Rule's reliance on objective evidence of intent and the specific probative evidence identified in the Rule. Indeed, plaintiffs have not demonstrated any prejudice from any lack of notice. They continue not to be able to identify a single specific comment that they would have submitted if they had been provided additional notice, much less an argument that was not already considered by the agency.**B.** The district court also erred in granting relief on plaintiffs' arbitrary-and-capricious claim. Although the court believed that the Rule reflected an unexplained fundamental shift in the agency's approach to braced firearms, that is incorrect. For one, as the Rule makes clear, ATF has long determined that braced firearms may be short-barreled rifles under the NFA

and, even before the Rule, classified the majority of submitted samples as short-barreled rifles. The Rule does not reflect the about-face that the district court perceived. Regardless, the Rule provides a fulsome explanation of the ways in which it differs from certain previous classification letters and of the reasons that ATF believes the Rule will promote consistent and correct determinations. In addition, the Rule is not arbitrarily vague, because it reasonably expands on the underlying statutory intent-based standard, which itself is common in civil and criminal law. Nor did the district court identify any specific applications of the Rule that raise vagueness concerns.

**II.** In all events, the district court erred in universally vacating the Rule. Instead, any proper relief had to be tailored in two ways: first, proper relief cannot restrain ATF from applying the Rule in the context of assessing and collecting the NFA's tax; and second, proper relief cannot extend beyond plaintiffs.

**A.** The Tax Anti-Injunction Act, which generally prohibits suits "for the purpose of restraining the assessment or collection of any tax," 26 U.S.C. § 7421(a), bars the universal vacatur entered by the district court. The NFA establishes a tax on the making and transfer of short-barreled rifles, and the district court's universal vacatur impermissibly interferes with ATF's chosen method of assessing that tax. The district court disregarded that limitation because it believed that the statute prohibited only orders styled as "injunctions" and not "vacaturs." But that is incorrect. By its terms, the statute applies to any order that impermissibly "restrain[s]" tax assessment, however styled. And the district court's vacatur has the effect of ordering ATF

officials to refrain from applying the Rule when those officials determine whether a tax must be paid on the making or transfer of a particular braced firearm. The vacatur thus impermissibly restrains ATF's assessment of taxes.

**B.** In addition, the district court's universal vacatur of the challenged provisions is unwarranted and unnecessary to remedy the injuries alleged by plaintiffs. The court made no judgment that such sweeping relief was appropriate as a matter of equity—instead, it believed that such relief was the default remedy for plaintiffs' APA claims. But the text of the APA, as well as the backdrop against which the statute was enacted and this Court's precedents, makes clear that universal vacatur is not automatic or compelled but is instead a discretionary equitable remedy.

Constitutional and equitable principles require limiting any relief to the named plaintiffs, which do not include unidentified members of the organizational plaintiff. As an initial matter, both Article III and principles of equity counsel that a court's remedial authority is generally limited to redressing the plaintiff's specific injuries. Here, such redress may—and thus must—be provided by party-specific relief. In addition, although the organizational plaintiff claims to represent hundreds of thousands unidentified members, the organization has failed to demonstrate the requisite indicia of membership—such as a membership structure and some ability for members to direct and control the organization—to litigate on their behalf. And even if the organization could demonstrate Article III standing, equitable principles on restricting asymmetric suits would compel forgoing relief to any member that has not

identified themselves in district court and agreed to be bound by the judgment. Finally, the need to strictly limit any vacatur is underscored by the substantial equities weighing in favor of implementation of the Rule, which serves important interests in public safety and regulatory clarity.

## STANDARD OF REVIEW

The district court's judgment rests on errors of law that are subject to de novo review. *See National Fed'n of the Blind of Tex., Inc. v. Abbott*, 647 F.3d 202, 208 (5th Cir. 2011).

## ARGUMENT

## I.     The District Court Erred in Granting Summary Judgment to Plaintiffs

### A.     The Government Is Entitled to Judgment on Plaintiffs' Logical-Outgrowth Claim

To make out their logical-outgrowth claim, plaintiffs need to demonstrate (1) that the Rule is a legislative rule subject to the APA's notice-and-comment requirements; (2) that the Rule differs so dramatically from the proposed rule that plaintiffs were denied a fair opportunity to comment on the Rule; and (3) that the lack of an opportunity to comment prejudiced plaintiffs. Plaintiffs' claim fails at each step. And although this Court previously held at the preliminary-injunction stage that plaintiffs were likely to succeed on their claim, *Mock v. Garland*, 75 F.4th 563 (5th Cir. 2023), this Court should reassess that conclusion and decline to adopt it on final judgment.

### 1. The Rule Is Interpretive

**a.** The Rule is an interpretive rule: it "clarifies, rather than creates, law." *FTI v. FAA*, 58 F.4th 230, 240 (5th Cir. 2023) (quotation omitted). In other words, in issuing the Rule, ATF did not "claim to be exercising authority to itself make positive law." *Id.* (quotation omitted).

The Rule instead articulates ATF's understanding of the best interpretation of the NFA. Enforcing the NFA requires ATF to assess whether short-barreled firearms are rifles—that is, whether they are "designed or redesigned, made or remade, and intended to be fired from the shoulder." 26 U.S.C. § 5845(c). The Rule sets out a regulatory definition, *see* 27 C.F.R. §§ 478.11, 479.11, to "clarify the meaning of this phrase," 88 Fed. Reg. at 6500, explaining the considerations that bear on whether a firearm with a stabilizing brace is designed and intended to be shoulder-fired. It is therefore a rule "issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers." *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 97 (2015) (quotation omitted). In short, the Rule "simply states what [ATF] thinks the [NFA] means," *Warshauer v. Solis*, 577 F.3d 1330, 1337 (11th Cir. 2009) (quotation omitted), and "explain[s] something the" NFA "already required," *Mendoza v. Perez*, 754 F.3d 1002, 1021 (D.C. Cir. 2014).

The Rule thus makes clear that it does not have the independent force and effect of law and that the statute is the source of legal force for imposing requirements on braced firearms. *See, e.g.*, 88 Fed. Reg. at 6478 ("[T]his rule does not

impose any new legal obligations on owners of 'stabilizing braces' at all, as any obligations for these owners result only from the NFA and the [Gun Control Act]. Instead, this rule merely conveys more clearly to the public the objective design features and other factors that indicate a weapon is in fact a firearm or short-barreled rifle under the relevant statutes."); *id.* at 6480 ("The revised definition in this final rule clarifies, consistent with the best interpretation of the statutory provision, that firearms with an attached 'stabilizing brace' can possess objective design features that make them 'rifles,' as that term is defined under the NFA[.]"); *id.* at 6501 ("[T]he rule does not create any new law; instead it simply implements the relevant statutes based on the Department's best interpretation of those statutes."); *see also id.* at 6500-02, 6507-11, 6531, 6548, 6551-57, 6559-61, 6569 (all similar). Thus, in any enforcement proceeding, the statute remains the operative law, and the government could not rely on the Rule to establish that a weapon is a rifle; instead, the adjudicator would apply the statute.

In this way, the Rule fits comfortably with agency actions that interpret "regulatory requirement[s] in light of [an agency]'s accumulated experience in [a] particular context." *POET Biorefining, LLC v. EPA*, 970 F.3d 392, 407 (D.C. Cir. 2020). Though such rules may sometimes "narrow or remove leeway afforded to regulated parties under a prior interpretation," they "remain[] interpretive so long as [they] can 'fairly be viewed as interpreting—even incorrectly—a statute or regulation.'" *Id.* at 408. Thus, for example, the Mine Safety and Health Administration

issued an "interpretive rule" when it advised that a chest x-ray needed a minimum opacity to count as a reportable "diagnosis" even where prior letters had afforded more leeway. *American Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1112 (D.C. Cir. 1993). And the Federal Aviation Administration issued a "quintessential interpretive rule" when it advised that the Federal Aviation Act's requirements for "common carriers" applied to a company that offered "planned itineraries to passengers willing to share the pilots' expenses" even though the petitioner protested that earlier guidance was more permissive. *Flytenow, Inc. v. FAA*, 808 F.3d 882, 884-85, 890 (D.C. Cir. 2015). The Rule here similarly reflects no more than an interpretation based on experience that certain considerations—such as a weapon's "objective design features," "marketing materials," and "likely use in the general community"—bear on the question whether a braced firearm is designed and intended to be fired from the shoulder and is thus a "rifle" under the NFA. 88 Fed. Reg. at 6480, 6495.

**b.** Nonetheless, in *Mock v. Garland*, 75 F.4th 563 (5th Cir. 2023), this Court concluded that plaintiffs were likely to succeed on their argument that the Rule is legislative, not interpretive. In reaching that conclusion, this Court articulated a new test for distinguishing legislative from interpretive rules that contains "five factors": (1) "whether the agency intended to speak with the force of law"; (2) whether the rule was published in the Code of Federal Regulations (C.F.R.); (3) whether the agency invoked its "general legislative authority"; (4) "whether the agency claimed *Chevron*

deference"; and (5) whether the rule will "produce significant effects on private interests." *Id.* at 580 (alteration and quotations omitted). And the Court concluded that the Rule appeared legislative under those factors, because it was published in the C.F.R., *id.* at 580; it contains "prospective, binding language" that the Court interpreted as suggesting an agency intent to speak with the force of law, *id.* at 580-81 (quotation omitted); it cites ATF's general rulemaking authority, *id.* at 581; and it will produce substantial economic effects, *id.* at 581-82. But that tentative conclusion misunderstands both the nature of the distinction between legislative and interpretive rules and also the character of the Rule; now on final judgment, this Court should decline to hold the Rule legislative.

As an initial matter, to the extent that *Mock* intended to suggest that its five factors may all be weighed against each other, that approach is incorrect. The five factors the Court listed are not a checklist for legislative rules; instead, they are characteristics a legislative rule might have. But what makes a rule a legislative rule, as the D.C. Circuit explained in the decision that *Mock* heavily drew on, is that "[l]egislative rules result from an agency's exercise of delegated legislative power" and thus "have the force and effect of law," while interpretive rules "are issued by an agency to advise the public of the agency's construction" of a statute. *Guedes v. ATF*, 920 F.3d 1, 17-18 (D.C. Cir. 2019) (per curiam) (quotations omitted). Thus, "[t]o determine whether a rule is legislative or interpretive," the bottom-line question that a

court must answer is "whether the agency intended to speak with the force of law." *Id.* at 18 (quotation omitted).

Of course, in circumstances where the question "whether the agency intended to speak with the force of law" is uncertain, courts may reasonably look to additional evidence—including some of the other factors identified in *Mock*. *See Guedes*, 920 F.3d at 18-20. But to the extent that an agency did not intend to speak with the force of law—the question that *Mock* identifies as the first "factor"—then the resulting rule is interpretive, even if (for example) it is published in the C.F.R. or it has large economic effects.

With that proper understanding, it is evident that the Rule is interpretive. As explained, *see supra* pp. 18-20, the Rule repeatedly makes clear that ATF was not intending to speak with the force and effect of law but was instead acting only to articulate its understanding of the best interpretation of the NFA. *See, e.g.*, 88 Fed. Reg. at 6478, 6480, 6500-02, 6507-11, 6531, 6548, 6551-57, 6559-61, 6569.

In nevertheless concluding that the Rule intended to speak with the force and effect of law, *Mock* focused on the Rule's inclusion of compliance options, which the Court interpreted as imposing legal obligations on the public. *See* 75 F.4th at 581. But that is incorrect. As the Rule explains, those compliance options do not alter the underlying statutory requirements or otherwise impose any legal obligations; instead, they reflect exercises of the agency's "own enforcement discretion" not to enforce the statute against members of the public who brought themselves into compliance in a

timely fashion. 88 Fed. Reg. at 6481. And such an agency action "that merely explains how the agency will enforce a statute or regulation—in other words, how it will exercise its broad enforcement discretion" under "some extant statute"—is "a general statement of policy" and not a legislative rule. *National Mining Ass'n v. McCarthy*, 758 F.3d 243, 252 (D.C. Cir. 2014).

In any event, in this case, the remaining factors identified in *Mock* do not outweigh the clear intent from the agency, repeatedly expressed in the preamble of the Rule, that it was not intending to speak with the force and effect of law. For one, neither the Rule's publication in the C.F.R. nor its citation of ATF's general rulemaking authority can bear much weight. Particularly given preexisting confusion and demand for greater transparency, ATF's determination to more clearly advise the regulated public of its interpretive views by including them in the C.F.R. does not transform the Rule from interpretive to legislative. *See, e.g.*, *Health Ins. Ass'n of Am. v. Shalala*, 23 F.3d 412, 423 (D.C. Cir. 1994) (publication in C.F.R. is just a "snippet of evidence of agency intent"); *American Tort Reform Ass'n v. Occupational Safety & Health Admin.*, 738 F.3d 387, 394 (D.C. Cir. 2013) (publication in C.F.R. is "not dispositive"); *City of Idaho Falls, Idaho v. FERC*, 629 F.3d 222, 227 (D.C. Cir. 2011) (publication in C.F.R. did not make rule legislative); *cf. National Park Hosp. Ass'n v. Department of Interior*, 538 U.S. 803, 809 (2003) (rule was "nothing more than a 'general statemen[t] of policy' designed to inform the public of [the agency's] views on the proper application of the [statute]" even though rule, which defined a term, was published in

the C.F.R. after notice and comment). That is especially true here, where the previous regulatory definition of the term "rifle" amended by the Rule was contained in the C.F.R. but was no doubt interpretive, as it merely parroted the statutory definition, *see* 27 C.F.R § 478.11 (effective Aug. 24, 2022). The new definition—contained in the same definitional section—has the same interpretive status. Nor is it particularly relevant that the agency correctly stated in the Rule that ATF has authority to issue regulations administering the NFA, *see* 88 Fed. Reg. at 6481; nothing about that statement reflects whether the agency was intending to exercise its authority to articulate its views about what the NFA requires or instead to speak with the force of law.

Finally, the fact that the Rule may have large practical economic effects is no more persuasive. Whether a rule has a "substantial impact" says "little about whether it is legislative rather than interpretive." *Mock*, 75 F.4th at 592 (Higginson, J., dissenting) (quotation omitted); *see also British Caledonian Airways, Ltd. v. C.A.B.*, 584 F.2d 982, 989 (D.C. Cir. 1978). Of course, many statutes have large economic effects, particularly when evaluated in aggregate across the entire country. As a result, large economic effects may flow from the decision regarding how best to interpret a statute. But that possibility does not undermine the fundamental nature of an interpretive rule as interpreting—rather than making—law.

## 2. The Rule Is a Logical Outgrowth of the Proposal

Even if the agency were required to follow notice-and-comment procedures in issuing the Rule, those requirements were satisfied here because the agency provided notice and an opportunity for comment, and the Rule was a "logical outgrowth" of the original proposal. *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 447 (5th Cir. 2021) (quotation omitted).

**a.** A proposed rule is not required to "specifically identify every precise proposal which the agency may ultimately adopt as a final rule," *Chemical Mfrs. Ass'n v. EPA*, 870 F.2d 177, 203 (5th Cir. 1989) (alteration and quotation omitted). Instead, a notice need only "adequately frame the subjects for discussion such that the affected party should have anticipated the agency's final course in light of the initial notice." *Huawei*, 2 F.4th at 447 (quotation omitted). The proposed rule here more than sufficed to "fairly appris[e] interested persons," *id.* at 448 (quotation omitted), of the Rule's general approach and the specific evidence of intent and design it identifies.

In its proposed rule, ATF announced its intent to amend the regulatory definition of "rifle." 86 Fed. Reg. 30,826, 30,826-29 (June 10, 2021). ATF stated that the Rule was designed to "publish[] the criteria" the agency uses to "evaluate on a case-by-case basis whether a particular firearm configured with a 'stabilizing brace' bears the objective features of a firearm designed and intended to be fired from the shoulder and is thus subject to the NFA." *Id.* at 30,828. ATF thus explained that it would consider evidence beyond a manufacturer's statements in determining whether

a firearm was designed and intended to be shoulder-fired and included a list of

specific factors—arranged in a points-based worksheet—that ATF proposed to

consider. *See id.* at 30,826-29.

Specifically, the agency made clear that "[t]he characterization of an accessory

by the manufacturer, including assertions in advertising, is not dispositive," and it

would also consider whether "the objective design features of the firearm, as

configured, . . . support the manufacturer's purported intent and, in fact, suggest an

altogether different intent." 86 Fed. Reg. at 30,828. It also explained that "likely use

may be relevant in assessing the manufacturer's or maker's purported intent with

respect to the design of a firearm." *Id.* ATF solicited comment on the proposed Rule

and ultimately received 237,000 comments from interested parties, *see* 88 Fed. Reg. at

6497, reflecting the clear notice provided by the proposal.

After the comment period ended, ATF made appropriately responsive changes

in "character with the original proposal." *Huawei*, 2 F.4th at 449 (quotation omitted).

Among other things, the agency simplified the points-based worksheet. The agency's

proposal specifically requested comment on "the clarity of th[e] proposed rule and

how it may be made easier to understand," 86 Fed. Reg. at 30,849, and in response,

several commenters suggested that the regulated public found the worksheet's

approach to be "confusing and overly complex," 88 Fed. Reg. at 6510. Heeding that

dissatisfaction, ATF abandoned the specific points-based system and instead

identified considerations—such as specific design features noted in the Worksheet—

that ATF would use to assess whether a firearm is designed and intended to be fired from the shoulder. *See id.* at 6513 ("[T]his rule clarifies and simplifies the criteria from the Worksheet . . . ."). In all cases, however, "the objective design features and factors listed in the rule that indicate the weapon is designed, made, and intended to be fired from the shoulder [we]re derived from the [notice of proposed rulemaking (NPRM)] and proposed Worksheet 4999." *Id.* at 6480; *see also id.* at 6494 ("The factors discussed in the NPRM will, under the final rule, continue to help determine whether a weapon meets the statutory definition of a 'rifle' . . . .").

ATF also further clarified its criteria based on comments requested and received. ATF solicited comment on whether it had "selected the most appropriate criteria for determining whether a stabilizing brace has made a firearm subject to the NFA" and whether commenters had "additional criteria that should be considered," raising those criteria for discussion. 86 Fed. Reg. at 30,850. In response, commenters sought assurance that ATF would continue to assess the manufacturer's "stated intent." 88 Fed. Reg. at 6544. ATF responded in turn by making clear that it would consider "direct and indirect marketing and promotional materials" and "likely use" to assess that intent. *Id.* These considerations were "derived from the NPRM," where the agency had already mentioned that such factors were relevant to assessing design and intent. *Id.* at 6480. Their inclusion reflects an appropriately responsive administrative process.

Although the Rule reflects some changes made from the proposal, that is not extraordinary. As this Court explained in *Huawei*, an agency may "permissibly implement[] changes in the final rule." 2 F.4th at 448. To the contrary, the whole purpose of the notice-and-comment process is to permit the agency to receive public input on a proposal and to adjust the proposal if necessary in light of that input. And where, as here, a final rule's "adoption of changes" was "responsive to [the] comments" received by the agency, that only "underlines that the rule logically emerged from the rulemaking." *Id.* at 449.

**b.** In nonetheless concluding that plaintiffs were likely to succeed on their argument that the Rule was not a logical outgrowth of the proposal, the *Mock* Court identified two specific differences between the Rule and proposal. First, the Court stated that there was a "conceptual" difference between the points-based worksheet (which the Court believed "allowed an individual to analyze his own weapon" and provided "an objective basis" for the resulting determination) and the Rule's "subjective balancing test" (which the Court believed makes it "nigh impossible for a regular citizen to determine what constitutes a braced pistol," *but see infra* pp. 34-39). *Mock*, 75 F.4th at 584. Second, the Court stated that two of the factors identified in the Rule—a manufacturer's marketing materials and information regarding a weapon's use in the community—were not included in the proposal. *Id.* at 585-86. But neither of those asserted differences between the proposal and the Rule justifies the conclusion that the Rule was not a logical outgrowth of the proposal.

First, the agency's shift from a points-based worksheet to a qualitative assessment incorporating many of the factors from the worksheet did not generate a fair notice problem. As explained, *see supra* pp. 25-28, both the proposed worksheet and the adopted Rule reflect a similar approach to how the agency will assess whether a firearm is designed and intended to be fired from the shoulder. Both make clear that a manufacturer's statements regarding its intent are not dispositive and that the agency will consider other objective evidence that may confirm or undermine that stated intent. And both adopt an approach that makes an individualized assessment of a particular firearm. Beyond this, the Rule continues to use the "factors discussed in the" proposal "to help determine whether a weapon meets the statutory definition of a 'rifle,'" 88 Fed. Reg. at 6494; indeed, "the objective design features and factors listed in the rule that indicate the weapon is designed, made, and intended to be fired from the shoulder are derived from the" proposal and worksheet, *id.* at 6480. Where the Rule and proposal primarily differ is that the Rule "clarifies and simplifies the criteria from the Worksheet." *Id.* at 6513. But as explained, *supra* pp. 25-28, that change was a direct and appropriate outgrowth of the comment process.

Moreover, although the *Mock* panel was concerned that commenters were not specifically on notice that ATF might adopt what the panel called a "subjective balancing test," 75 F.4th at 584, the comments show that this is not the case, *see Huawei*, 2 F.4th at 448-49 (examining comments as evidence of fair notice). Commenters criticized the proposed worksheet on the same (unpersuasive) grounds

as the Rule: that it "contain[ed] ambiguous terms that are subject to interpretation and no measurable standards for many of the criteria"; "that the highly subjective factors would allow ATF to arbitrarily weigh points in favor of regulation under the NFA"; and that "the ATF Worksheet 4999 was subjective." 88 Fed. Reg. at 6513. Such parties were thus "fairly acquainted" with the relevant "subject and issues" and had ample opportunity to provide comments on the perceived subjective nature of the proposal, *Huawei*, 2 F.4th at 449; that the agency rejected those comments does not demonstrate a lack of notice.

Second, the *Mock* panel was incorrect to state that the public did not have an adequate opportunity to comment on two of the factors identified in the Rule. That statement proceeded from the Court's erroneous premise that two of the factors—a manufacturer's "direct and indirect marketing and promotional materials" and other information "demonstrating the likely use of the weapon in the general community," 88 Fed. Reg. at 6480—did not appear at all in the proposed rule. Although those factors did not appear on the worksheet included with the proposed rule, the proposal made clear that "regardless of the points accrued" on the worksheet, "efforts to advertise" "short-barreled rifles as such will result in a classification as a 'rifle'" because those efforts remove "any question" about the manufacturer's intent. 86 Fed. Reg. at 30,834 (quotation omitted). And the proposed rule also made clear ATF's understanding that a brace's "likely use may be relevant in assessing the manufacturer's or maker's purported intent." *Id.* at 30,828. Thus, commenters were

properly advised of the existence of those factors and the possibility that ATF might incorporate them into its final Rule and were able to submit any comments on the evaluation of that information that they wished.

### 3. Plaintiffs Have Not Demonstrated Prejudice from Any Notice Error

Even if the Rule had not been a logical outgrowth of the proposed rule, plaintiffs would not be entitled to relief on their claim because they have failed to demonstrate prejudice from any error. Under the APA, a plaintiff must "demonstrate prejudice from" the agency's asserted error to obtain relief. *City of Arlington v. FCC*, 668 F.3d 229, 243 (5th Cir. 2012) (quotation omitted), *aff'd*, 569 U.S. 290 (2013). In the specific circumstance where an agency fails to provide adequate notice, a plaintiff attempting to demonstrate prejudice from that error is required to show "that, if given the opportunity to comment, [the plaintiff] would have presented an argument the [agency] did not consider in issuing the" regulation. *United States v. Johnson*, 632 F.3d 912, 932 (5th Cir. 2011). In other words, without some identification of "any new information [a plaintiff] would have submitted to the agency if given the opportunity," the plaintiff cannot demonstrate that it was prejudiced by any failure to provide an adequate opportunity to comment. *Texas v. Lyng*, 868 F.2d 795, 800 (5th Cir. 1989).

Moreover, the required prejudice analysis is party-specific. Congress directed that, in reviewing a claim under the APA, courts must take "due account" of "the rule

of prejudicial error," 5 U.S.C. § 706, and prejudice is an inherently party-specific inquiry, *cf. Prejudice*, Black's Law Dictionary (12th ed. 2024) ("Damage or detriment to one's legal rights or claims."). Thus, this Court has repeatedly made clear, including in the deficient notice context, that "the party asserting error" under the APA must "demonstrate prejudice from the error." *City of Arlington*, 668 F.3d at 243 (quotation omitted). And the determination "whether an APA deficiency is harmless demands a case-specific inquiry." *Johnson*, 632 F.3d at 930. Consistent with that understanding of the prejudice requirement, this Court has required a plaintiff advancing a claim that it lacked proper notice to demonstrate that it specifically "would have presented an argument" not considered by the agency if it had received proper notice. *Id.* at 932; *see Lyng*, 868 F.2d at 800 (similar); *see also, e.g., Mid Continent Nail Corp. v. United States*, 846 F.3d 1364, 1383-85 (Fed. Cir. 2017); *United States v. Reynolds*, 710 F.3d 498, 516 (3d Cir. 2013); *City of Waukesha v. EPA*, 320 F.3d 228, 246 (D.C. Cir. 2003) (per curiam).

But in the district court, plaintiffs did not even attempt to make such a showing. Indeed, they did not identify a single specific comment that they would have submitted if they had been provided additional notice—much less did they identify any substantial such comments or arguments that were not already considered by the agency. *See* ROA.1031-34. In resolving the preliminary injunction in *Mock*, this Court stated—without citation to any specific part of the record—that plaintiffs had met their burden by "suggest[ing], through briefing, a number of comments they would have liked to have made against the Final Rule." 75 F.4th at 586 n.58. That statement

has not been borne out at final judgment. Plaintiffs never identified any such comment, despite the government articulating this requirement again in its summary judgment briefing. *Compare* ROA.1240-41 (government's brief explaining the requirement), *with* ROA.1289-90 (plaintiffs' reply brief failing to identify any specific comment).

## B. The Rule Is Not Arbitrary and Capricious

In addition to relying on this Court's holding in *Mock,* the district court concluded that the Rule is unlawful because it is arbitrary and capricious. The court did so on two bases: first, the court held that the Rule failed to provide sufficient explanation for a "fundamental[] switch[]" of ATF's position on how to classify braced firearms, ROA.1953-55; and second, the court held that the Rule's qualitative balancing test was arbitrarily vague, ROA.1955-56. But the "highly deferential" arbitrary-and-capricious standard provides only for "narrow" review. *Handley v. Chapman*, 587 F.3d 273, 281 (5th Cir. 2009). To clear that bar, agency action need only be "reasonable and reasonably explained," meaning that the agency has "reasonably considered the relevant issues and reasonably explained the [agency's] decision." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). The Rule more than meets that bar, and the district court's contrary conclusion is erroneous.

**1.** The district court's conclusion that the Rule fundamentally switches ATF's approach to braced firearms without sufficient explanation is incorrect on all levels. Contrary to the court's suggestion, the Rule does not reflect any such fundamental

shift. And regardless, ATF properly acknowledged and reasonably explained any departure from its previous approach.

At the outset, the district court's statement that the Rule reflects a fundamental shift in ATF's approach is incorrect. Before the Rule, ATF made clear that designing a "stabilizing brace for use as a shoulder stock" may yield a short-barreled rifle, and ATF made classification determinations on a case-by-case basis with "the majority" of submitted samples classified as short-barreled rifles. 88 Fed. Reg. at 6482, 6487, 6492 (quotation omitted).

Similarly, ATF has made clear in the Rule that the statutory determination whether any particular braced firearm is a short-barreled rifle must be made based on the particular design features and other relevant evidence specific to any particular weapon platform. *See* 88 Fed. Reg. at 6569 (stating that a braced firearm will be classified as a short-barreled rifle only if, among other things, the evidence "indicate[s] that the weapon is designed, made, and intended to be fired from the shoulder"). The Rule estimates that at least "a majority" of existing firearms equipped with braces are likely to be classified as "rifles" or "short-barreled rifles" configured to be fired from the shoulder. *Id.* at 6480. But the Rule also clarifies that it is possible to design a braced weapon that is not a rifle. For example, a braced weapon might not have "a surface area that allows shouldering"—as with "an elastic strap that wraps around the shooter's wrist." *Id.* at 6529-30. Or it might have "a feature intended specifically to

prevent shooting the firearm from the shoulder," such as "a permanently attached protrusion" that would prevent comfortable shouldering. *Id.* at 6530.

Thus, at bottom, the Rule does not reflect any fundamental or categorical shift in ATF's approach to classifying braced firearms. Both before and after the Rule, ATF has understood that the majority of braced firearms are likely to be short-barreled rifles and has employed a case-by-case approach to determining whether any particular braced firearm is designed and intended to be fired from the shoulder. Thus, far from reflecting some about-face by the agency, the Rule simply reflects ATF's attempt to refine and clarify its approach to the question of how to apply the statute to braced weapons.

Nevertheless, the Rule also acknowledges that the approach articulated in the Rule is not wholly consistent with the approach reflected in each classification letter issued before the Rule. That is so in large part because, as the Rule explains, the previous classification letters themselves were not always consistent, either in their methodologies or in their conclusions. 88 Fed. Reg. at 6482, 6484 n.26; *see id.* at 6479 n.9 (collecting examples). Thus, for example, some early letters sometimes focused on irrelevant factors that did not properly reflect the statutory design-and-intent standard, and they sometimes placed improper weight on a manufacturer's stated intentions. *See id.* at 6501-02.

It was precisely this inconsistency that the agency sought to remedy through the Rule. As the Rule explains, the agency's inconsistent approach "had led to

confusion" among the regulated public; to classifications that did not comport with the best understanding of the NFA; and to "an incorrect public perception" that "a firearm equipped with a 'stabilizing brace' never falls within the purview of the NFA." 88 Fed. Reg. at 6494, 6501-02. And ATF further came to understand that, as was made "abundantly evident in publications and consumer and marketing material issued by firearms manufacturers," the firearms industry and consumers were widely circumventing the NFA through the "prevalent use of [braced] firearms as rifles." *Id.* at 6503-06.

In short, the Rule acknowledges that the approaches reflected in previous classification letters were not always consistent with each other or with the approach articulated in the Rule. And the Rule explains that the purposes of issuing the Rule include promoting regulatory clarity; preventing circumvention of the NFA; and ensuring that ATF will consistently use "the proper legal and factual analysis" in determining whether a braced firearm is subject to the NFA. 88 Fed. Reg. at 6502. Those benefits more than justify any change in the agency's position, in part because an agency's decision that a new interpretation is "more consistent with statutory language" always "justif[ies] its policy choice." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 223-24 (2016) (quotation omitted). Thus, the Rule more than satisfies the agency's obligation to "display awareness that" the Rule reflects a shift in the agency's approach and to articulate "good reasons for" the Rule's approach. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). That is all the APA demands.

36

**2.** The district court was also incorrect to conclude that the Rule's qualitative standard is arbitrarily vague. The Rule proceeds from the statute's "comprehensible normative standard"—whether a weapon is designed, made, and intended to be fired from the shoulder. *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 n.7 (1982) (quotation omitted). Statutory intent standards, which are common in civil and criminal law, have a generally "settled legal meaning[]," *Holder v. Humanitarian Law Project*, 561 U.S. 1, 20 (2010) (quotation omitted); *see also Hoffman Estates*, 455 U.S. at 500-01 (rejecting vagueness challenge to "designed for use" standard). And the district court did not conclude—much less point to any authority to support the notion—that such a focus on design and intent is itself impermissibly vague.

The Rule then builds on the statutory intent-based standard by "defin[ing] and explain[ing] the criteria" ATF considers relevant to a party's intent. *Catawba County v. EPA*, 571 F.3d 20, 39 (D.C. Cir. 2009) (per curiam). That additional explanation—layered on top of a statutory standard that the district court did not conclude is itself vague—is more than enough to give a "person of ordinary intelligence a reasonable opportunity to know what is prohibited." *Texas Democratic Party v. Abbott*, 961 F.3d 389, 409 (5th Cir. 2020) (quotation omitted).

Nor does the fact that the Rule provides this guidance through a qualitative balancing test lead to impermissible vagueness. An agency is free to apply "multifaceted considerations" without offending fair notice principles so long as it

provides "comprehensible and actionable guidance about the standards" it will employ. *Northstar Wireless, LLC v. FCC*, 38 F.4th 190, 218-19 (D.C. Cir. 2022); *see also, e.g.*, *Texas v. EPA*, 983 F.3d 826, 839-40 (5th Cir. 2020) (upholding an agency's use of a "multi-factor balancing test"). The Rule—which goes into substantial detail regarding each category of evidence it deems relevant to the statutory inquiry—meets that standard.

The Rule's choice to eschew quantitative metrics in favor of qualitative standards is particularly appropriate in this context, where the Rule is interpreting a statutory requirement that is itself a qualitative standard: whether a firearm is "designed," "made," and "intended to be fired from the shoulder," 26 U.S.C. § 5845(c). That statutory standard is holistic, requiring consideration of all relevant evidence in a specific case. And it is commonplace for Congress to impose such intent-based standards without delineating specific types of relevant evidence in the statute—but for agencies or courts to nevertheless articulate types of evidence that may generally be probative of the question of intent. Thus, for example, this Court has laid out categories of evidence that will be probative of a criminal defendant's "intent to distribute" controlled substances, such as the possession of a "large" quantity of drugs and the presence of "drug paraphernalia, guns, or large quantities of cash." *United States v. Kates*, 174 F.3d 580, 582 (5th Cir. 1999) (per curiam). This Court did not create a vagueness problem by using a holistic, totality-of-the-evidence

approach—or by articulating multiple factors relevant to that inquiry even without precise quantification.

Nor should the district court have addressed the Rule's asserted vagueness in a vacuum: A court must "consider whether a statute is vague as applied to the particular facts at issue," because a plaintiff "cannot complain of the vagueness of the law as applied to the conduct of others." *Humanitarian Law Project*, 561 U.S. at 18-19 (quotation omitted). The district court did not identify any specific braced firearm for which it is unclear how the statute and Rule might apply. And if a party remained uncertain about how ATF will classify any particular braced firearm, he could "request a classification determination from ATF for additional clarity." 88 Fed. Reg. at 6552. That ability to receive additional clarity "by resort to an administrative process" ameliorates any harm from claimed vagueness. *Hoffman Estates*, 455 U.S. at 498.

## II.     The District Court Erred in Universally Vacating the Rule

Even if plaintiffs were correct on the merits of any of their claims, the district court erred in vacating the Rule universally. Instead, the district court was required to limit any relief in two ways. First, the court could not permissibly vacate the Rule as applied to ATF's assessment of tax liability under the NFA, because such pre-enforcement relief is barred in the tax context by the Tax Anti-Injunction Act, 26 U.S.C. § 7421(a). Second, the court could not permissibly vacate the Rule with respect to anybody beyond the named plaintiffs to this suit; such broad relief is not required

to redress the named plaintiffs' own claimed injuries and is thus precluded by traditional constitutional and equitable principles.

## A. The Tax Anti-Injunction Act Precluded the District Court's Vacatur of the Rule as Used to Determine Tax Liability

**1.** The Tax Anti-Injunction Act provides that, with certain enumerated exceptions, "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed." 26 U.S.C. § 7421(a). That "broad and mandatory language," *United States v. Clintwood Elkhorn Mining Co.*, 553 U.S. 1, 12 (2008), "could scarcely be more explicit" in precluding pre-payment suits, *Bob Jones Univ. v. Simon*, 416 U.S. 725, 736 (1974).

As this Court has explained, the Tax Anti-Injunction Act "protects the Government's ability to collect a consistent stream of revenue, by barring litigation to enjoin or otherwise obstruct the collection of taxes." *Hotze v. Burwell*, 784 F.3d 984, 996 (5th Cir. 2015) (quotation omitted). And although in many contexts a litigant might seek declaratory rather than injunctive relief in a pre-enforcement suit, the Declaratory Judgment Act does not authorize declaratory judgments "with respect to Federal taxes." 28 U.S.C. § 2201(a). Thus, Congress has enacted a bright-line scheme that broadly requires parties to "pay first and litigate later." *Flora v. United States*, 357 U.S. 63, 75 (1958) (quotation omitted).

Instead of seeking pre-enforcement relief, the principal mechanism that a taxpayer can use to dispute the assessment of a tax is a refund suit. In the NFA context, a firearm maker or transferor who wishes to challenge the assessment of the NFA's tax against him may pay the tax and then file a claim for a refund or credit with the Attorney General. *See* 26 U.S.C. § 6511. If that claim is denied or six months elapse without a determination, he may bring suit to recover the sum. *See id.* §§ 6532(a)(1), 7422. That refund-suit remedy "offer[s a taxpayer] a full, albeit delayed, opportunity to litigate the legality" of a disputed tax. *Bob Jones*, 416 U.S. at 746.

The district court's vacatur of the Rule as it applies to taxing determinations is barred by these provisions. As explained, *see supra* pp. 4-6, 18-19, administering the NFA's scheme requires ATF to determine whether any specific firearm fits the statutory definition of a short-barreled rifle. The Rule reflects ATF's approach to making that determination in all contexts, including when determining whether the maker or transferor of a particular firearm must pay the required tax. Thus, even if the district court could permissibly provide relief barring ATF from applying the Rule when engaging in activities other than tax assessment—such as determining whether particular firearms must be registered under the NFA—the court could not properly extend that relief to the context of tax determinations. By refusing to cabin its vacatur to non-tax contexts, then, the district court has impermissibly restrained ATF from assessing and collecting the NFA's tax.

**2.** In nevertheless vacating the Rule, the district court did not seriously consider whether that relief was barred by the Tax Anti-Injunction Act. Instead, the court seemed to believe that the statute bars only relief that is termed injunctive; because there are "meaningful differences between an injunction" and "vacatur" and because the court did not grant plaintiffs' request for an injunction, the court believed that the government's Tax Anti-Injunction Act arguments were "moot." ROA.1951.

But the district court's understanding of the statutory bar as limited to orders termed "injunctions" is impossible to square with the text of the statute, which is not limited to "injunctions." Instead, the statute prohibits any suit "for the purpose of restraining"—not merely "enjoining"—"the assessment or collection of any tax." 26 U.S.C. § 7421(a). To "restrain" action means to "limit" or "put compulsion upon" it. *See Restrain*, Black's Law Dictionary (6th ed. 1990). As used here, the term makes clear that plaintiffs may not maintain any suit seeking (and thus courts may not properly grant) coercive relief that "interfere[s] with the Government's efforts to" assess and collect taxes. *Garland v. Aleman Gonzalez*, 596 U.S. 543, 551 (2022). Vacatur "restrict[s] or stop[s] official action," *Direct Mktg. Ass'n v. Brohl*, 575 U.S. 1, 13 (2015), by prohibiting officials from carrying out the agency action under review. Vacating the interpretive rule that ATF would otherwise employ while assessing and collecting the NFA's tax thus plainly "restrain[s]" ATF's assessment and collection of that tax.

Even had the statute used the term "injunction," the district court's analysis would be erroneous. The Supreme Court has repeatedly given a broad interpretation

42

to that term. For example, the Court interpreted a statute conferring jurisdiction over appeals from "injunction[s]" in certain civil actions to apply to orders with a "coercive" effect. *Aberdeen & Rockfish R.R. v. Students Challenging Regulatory Agency Procedures (S.C.R.A.P.)*, 422 U.S. 289, 307 (1975). The Court commented that it had "repeatedly exercised jurisdiction under [the provision] over appeals from orders" that were "not cast in injunctive language but which by their terms simply 'set aside' or declined to 'set aside' orders of the [agency]." *Id.* at 308 n.11. Here, too, the district court's order vacating the Rule qualifies as a "restrain[t]" barred by the Tax Anti-Injunction Act.

## B. The District Court Erred in Providing Relief to Non-Plaintiffs, Including Unidentified Members of the Organizational Plaintiff

Even setting aside the Tax Anti-Injunction Act, this Court should reverse the district court's universal vacatur of the Rule. In imposing that universal remedy, the district court failed to consider either the balance of equities or the public interest. Instead, the court treated such universal relief as flowing automatically from its finding that the Rule was improperly promulgated. That reasoning was erroneous, and constitutional and equitable principles do not support extending any vacatur beyond the named plaintiffs.

### 1. The District Court Improperly Failed to Consider Whether the Balance of Equities and the Public Interest Justified Its Universal Remedies

Even if the district court's decision on the merits were correct, the court erred in ordering universal vacatur of the Rule without any consideration of equitable principles. In explaining its decision, the court did not suggest that such relief was necessary to remedy any injuries to plaintiffs or was consonant with equitable principles. Instead, the court appeared to believe that party-specific vacatur would be "more akin to an injunction" than to "vacatur" and that universal vacatur is thus the "default" remedy for APA violations. ROA.1958.

That is incorrect. Although this Court's precedents identify vacatur as an available remedy for a successful APA challenge to a regulation, *see, e.g., Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 374-75 (5th Cir. 2022), the APA itself does not reference vacatur, instead remitting plaintiffs to traditional equitable remedies like injunctions, 5 U.S.C. § 703, and there is little indication that Congress intended to create a new and radically different remedy in providing that courts reviewing agency action should "set aside" agency "action, findings, and conclusions," *id.* § 706(2); *see United States v. Texas*, 599 U.S. 670, 693 (2023) (Gorsuch, J., joined by Thomas and Barrett, JJ., concurring in the judgment) (detailing "serious" arguments that "warrant careful consideration" as to whether the APA "empowers courts to vacate agency action").

In any event, even assuming that the APA authorizes vacatur, the district court erroneously decided to enter a universal vacatur without considering whether

equitable principles supported such relief. Text and precedent both make clear that the decision whether to enter vacatur—and the scope of any such relief—is constrained by equitable principles. And those principles limit proper relief to redressing the injuries of the named parties, thus foreclosing universal vacatur in this case.

In light of traditional equitable principles generally restricting relief beyond the parties, the APA is not properly read to require vacatur—much less universal vacatur—of a challenged action.. Congress enacted the APA against a background rule that statutory remedies must be construed in accordance with "traditions of equity practice." *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944). The Supreme Court has recently reinforced this principle of interpretation, instructing that "[w]hen Congress empowers courts to grant equitable relief, there is a strong presumption that courts will exercise that authority in a manner consistent with traditional principles of equity." *Starbucks Corp. v. McKinney*, 144 S. Ct. 1570, 1576 (2024). And the Court explained that even seemingly mandatory statutory language—such as a directive "that an injunction 'shall be granted' if" certain conditions are met—will not "supplant the traditional equitable principles governing" relief; "such an abrupt departure from traditional equity practice" as requiring relief no matter the equities requires "plain[er]" language than that. *Id.* at 1577 (quotations omitted); *see also Hecht Co.*, 321 U.S. at 329 (Congress's authorization for courts to issue a remedy "hardly suggests an absolute duty" to grant such relief "under any and all circumstances.").

So too with the APA. As an initial matter, the APA itself provides for traditional forms of equitable actions and relief, such as "declaratory judgments or writs of prohibit[ion] or mandatory injunction," 5 U.S.C. § 703, and explicitly preserves "the power or duty of the court to … deny relief on any … equitable ground," *id.* § 702(1). In light of the traditional equitable principles against which the statute was enacted—and which are explicitly incorporated into the statute—there is no sound reason to conclude that Congress's adoption of the unremarkable "set aside" language in § 706 reflected a decision to compel courts to abandon "the bedrock practice of case-by-case judgments with respect to the parties in each case." *Texas*, 599 U.S. at 695 (Gorsuch, J., joined by Thomas and Barrett, JJ., concurring in the judgment) (quotations omitted).

That construction of the APA—as permitting, but not requiring, universal vacatur—coheres with this Court's precedent. This Court has treated universal vacatur of agency action as a discretionary equitable remedy—not a remedy that is automatic or compelled. *See, e.g.*, *Cargill v. Garland*, 57 F.4th 447, 472 (5th Cir. 2023) (en banc) (plurality opinion) (concluding without contradiction from any other member of the Court that the district court could consider on remand "a more limited remedy" than universal vacatur of the final rule and instructing the district court to "determine what remedy—injunctive, declarative, or otherwise—is appropriate to effectuate" the judgment); *see also id.* (recognizing that a "plaintiff's remedy must be tailored to redress the plaintiff's particular injury" (quotation omitted). That makes sense; to the extent

46

the APA permits vacatur at all, it makes explicit that its provisions do not affect "the power or duty of the court" to "deny relief on" any "equitable ground." 5 U.S.C. § 702(1). Thus, the district court here was required to consider whether the equities warranted entry of vacatur at all.

The error in the district court's remedial analysis is underscored by its comparison of vacatur to injunctions. The problems caused by universal injunctions are well catalogued; they include that such injunctions conflict with principles of Article III and equity, circumvent Rule 23's class-action requirements, "incentivize forum shopping," "short-circuit the decisionmaking benefits of having different courts weigh in on vexing questions of law," and overburden courts' "emergency dockets." *See, e.g.*, *Arizona v. Biden*, 40 F.4th 375, 396 (6th Cir. 2022) (Sutton, C.J., concurring). And those concerns apply equally to universal vacatur. *Texas*, 599 U.S. at 701-04 (Gorsuch, J., concurring in the judgment). For those reasons, universal vacatur should, at a minimum, be reserved for "truly extraordinary circumstances." *Id.* at 702. No such circumstances exist here. The district court's remedial order should be reversed.

### 2. Constitutional and Equitable Principles Precluded the District Court's Universal Vacatur in This Case

As discussed above, the district court entered a universal vacatur of the Rule without identifying any extraordinary circumstances supporting universal, rather than party-specific, relief—and without even considering the balance of equities or the

public interest. And under the relevant equitable principles, it would have been a clear abuse of discretion to conclude that the universal vacatur was justified. Instead, constitutional and equitable principles required the district court to limit any relief to the named parties to this case, which do not include the many unidentified members of the organizational plaintiff.

*First*, Article III and fundamental equitable principles should have counseled the district court to limit any relief to the named plaintiffs in this case. Under Article III, "a plaintiff's remedy must be limited to the inadequacy that produced his injury." *Gill v. Whitford*, 585 U.S. 48, 66 (2018) (alteration and quotations omitted). Principles of equity reinforce that constitutional limitation, because equitable relief must "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).

Those principles required limiting any relief to plaintiffs. In entering relief that went beyond plaintiffs, the district court did not conclude that such a universal vacatur was necessary to redress plaintiffs' asserted injuries. *See* ROA.1957-58. To the contrary, in its earlier decision entering a plaintiff-specific preliminary injunction, the district court concluded that nationwide relief was unwarranted because a plaintiff-specific injunction "afford[ed] sufficient relief to meet each [p]laintiff's present needs." ROA.993. The district court should have followed the same course at final judgment.

Moreover, to the extent that the district court believed that vacatur inherently operates universally, that belief was incorrect. Indeed, in other circumstances, courts recognize that the scope of a vacatur is subject to equitable considerations. For example, the general practice is to vacate a district court judgment only as to the party or parties that appeal, not as to non-appealing parties, though that rule is subject to relaxation based on equitable considerations. *See, e.g.*, *In re Taylor*, 655 F.3d 274, 287 (3d Cir. 2011) ("Ordinarily, of course, a party which does not appeal a decision by a district court cannot receive relief with respect to that decision."); *Tompkins v. Cyr*, 202 F.3d 770, 786-87 (5th Cir. 2000) (vacating erroneous damages calculation only as to "the losing defendants who have appealed" and declining to "vacate the damage award against the non-appealing defendants").

But even if the court were correct that party-limited vacaturs are impermissible, the court should instead have declined to enter vacatur altogether in favor of plaintiff-limited equitable relief. Alternatively, the district court could have entered the equitable remedy that this Court has described as "remand without vacatur." *Texas v. United States*, 50 F.4th 498, 529 (5th Cir. 2022). Such relief is "generally appropriate when there is at least a serious possibility that the agency will be able to substantiate its decision given an opportunity to do so" and where vacatur would be "disruptive." *See id.* (quotation omitted). The procedural deficiencies in the Rule perceived by the district court are exactly the sorts of errors amenable to correction on remand, through additional notice-and-comment processes and explanation. And remand

without vacatur is particularly appropriate here in light of the countervailing public-safety and regulatory-clarity interests in maintaining the Rule. *See infra* pp. 52-53.

*Second*, the district court should not have extended relief to the hundreds of thousands, or more, unidentified members of the organizational plaintiff, the Firearms Policy Coalition. As an initial matter, the Firearms Policy Coalition failed to properly demonstrate that it has standing to litigate on behalf of its members, because it has not shown that it is a bona fide membership organization. It has not identified any "indicia of membership," such as "a clearly articulated and understandable membership structure" with members who "elect[] the governing body," nor has it explained how its members direct or control the organization. *Friends of the Earth, Inc. v. Chevron Chem. Co.*, 129 F.3d 826, 829 (5th Cir. 1997) (quotations omitted). To the contrary, the Firearms Policy Coalition's explanation that it has "hundreds of thousands of members across the country" and that any individual may join the organization by making a donation through its website, ROA.346-47, suggests the lack of any such structure or member control.

In short, although the organizational plaintiff labels its donors and supporters as "members," nothing in the record suggests this is true in the relevant sense, nor is there any reason to believe that its hundreds of thousands so-labeled "members" exercise any oversight or control of the organization. Nor does anything in the record suggest that the organization's "members" specifically control—or are even aware of—this litigation that is purportedly on their behalf or that they understand that they

may be bound by any adverse judgment on their claims. In these circumstances, as this Court's commonsense rule articulated in *Friends of the Earth* makes clear, the organizational plaintiff may not purport to litigate on behalf of all its many unidentified members.

Regardless, even if it were correct that the plaintiff organization could satisfy Article III's requirements to sue on behalf of its hundreds of thousands of members, equitable principles would compel forgoing relief to any member who has not been identified in district court and agreed to be bound by the judgment. Such a restriction on relief would promote longstanding equitable principles that a party has one opportunity for relief and that the effect of any judgment should be bidirectional. *Cf. Arizona*, 40 F.4th at 397 (Sutton, C.J., concurring) (explaining the equitable and historical problems with "asymmetric" suits). Those concerns are heightened in this context, where many large membership organizations have brought suits challenging the Rule in different venues. *See Second Amendment Found. v. ATF*, No. 3:21-cv-116 (N.D. Tex.) (Second Amendment Foundation); *Texas Gun Rights, Inc. v. ATF*, No. 4:23-cv-578 (N.D. Tex.) (Texas Gun Rights and National Association for Gun Rights); *Texas v. ATF*, No. 6:23-cv-13 (S.D. Tex.) (Gun Owners of America); *NRA v. ATF*, No. 3:23-cv-1471 (N.D. Tex.) (National Rifle Association).

To the extent that there is overlap between the collective asserted millions of members of the organizations litigating claims against the Rule across five lawsuits, permitting each organizational plaintiff to litigate on behalf of all its claimed members

51

would allow improper duplication of individual members' claims. Such a result would improperly provide individual members of multiple organizations repeated bites at the apple, permitting them to obtain relief if only one organization's suit succeeds even if many others' suits fail. That scheme—embraced by the district court—undermines basic principles of preclusion and perpetuates the unfair asymmetry those precepts seek to guard against.

*Third*, the need to carefully limit any vacatur of the challenged provisions is underscored by the substantial regulatory-clarity and public-safety interests that the Rule promotes. ATF's previous case-by-case "classification determinations had led to confusion" about how to evaluate a braced firearm and inconsistent determinations. *See* 88 Fed. Reg. at 6484 n.26, 6494. Thus, the Rule provides an in-depth explanation of the proper approach for the benefit of the agency and the regulated public. Enjoining the Rule would promote confusion and might require ATF to revert to an outdated approach "that no longer reflects its current enforcement thinking," which "is not in the public interest." *MediNatura, Inc. v. FDA*, 998 F.3d 931, 945 (D.C. Cir. 2021).

Moreover, the NFA, and the Rule clarifying its application, benefit public safety. As explained, Congress has found that short-barreled rifles are powerful concealable weapons that can "be used readily and efficiently by criminals," H.R. Rep. No. 83-1337, at A395, and has established a registration-and-taxation scheme to track such firearms to keep them away from non-law-abiding citizens. The Rule reinforces

those controls that Congress deemed necessary for public safety by preventing circumvention of the requirements.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed.

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney*
*General*

LEIGHA SIMONTON
*United States Attorney*

ABBY C. WRIGHT
SEAN. R. JANDA

*s/ Ben Lewis*
BEN LEWIS
*Attorneys, Appellate Staff*
*Civil Division, Room 7250*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-2494*
*benjamin.r.lewis@usdoj.gov*

October 2024

**CERTIFICATE OF SERVICE**

I hereby certify that on October 7, 2024, I electronically filed the foregoing

brief with the Clerk of the Court for the United States Court of Appeals for the Fifth

Circuit by using the appellate CM/ECF system. Service will be accomplished by the

appellate CM/ECF system.


*s/ Ben Lewis*
Ben Lewis

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,949 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Ben Lewis*
Ben Lewis