No. 24-10743

# In the United States Court of Appeals for the Fifth Circuit

WILLIAM T. MOCK; CHRISTOPHER LEWIS;
FIREARMS POLICY COALITION, INCORPORATED, a nonprofit corporation;
MAXIM DEFENSE INDUSTRIES, L.L.C.,

*Plaintiffs-Appellees*,

v.

MERRICK GARLAND, in his official capacity as
Attorney General of the United States; UNITED STATES DEPARTMENT OF JUSTICE;
BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES;
STEVEN DETTELBACH, in his official capacity as the Director of the
Bureau of Alcohol, Tobacco, Firearms and Explosives,

*Defendants-Appellants*.

On Appeal from
United States District Court for the Northern District of Texas, 4:23-cv-95-O

## BRIEF FOR PLAINTIFFS-APPELLEES

Cody J. Wisniewski
FPC ACTION FOUNDATION
5550 Painted Mirage Road
Suite 320
Las Vegas, NV 89149
Telephone: (615) 955-4306
cwi@fpcafhq.org

Bradley A. Benbrook
 *Counsel of Record*
Stephen M. Duvernay
BENBROOK LAW GROUP, P.C.
701 University Avenue, Suite 106
Sacramento, CA  95825
Telephone: (916) 447-4900
brad@benbrooklawgroup.com
steve@benbrooklawgroup.com

*Counsel for Plaintiffs-Appellees*

# CERTIFICATE OF INTERESTED PERSONS

No. 24-10743

*William T. Mock, et al. v. Merrick Garland, et al.*

I certify that the following persons and entities as described in the fourth sentence of Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made so the judges of this Court may evaluate possible disqualification or recusal:

1) Plaintiffs-Appellees:

William T. Mock

Christopher Lewis

Maxim Defense Industries, LLC, a limited liability company, is a wholly-owned subsidiary of Maxim Defense Group, Inc., a Florida S-Corp. Maxim Defense Group, Inc., has no parent corporation and there is no publicly held corporation that owns 10% or more of its stock.

Firearms Policy Coalition, Inc., a nonprofit corporation has no parent corporation and there is no publicly held corporation that owns 10% or more of its stock.

2) Defendants-Appellants:

Merrick Garland, in his official capacity as Attorney General of the United States

United States Department of Justice

Steve Dettelbach, in his official capacity as the Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives

Bureau of Alcohol, Tobacco, Firearms and Explosives

3) Counsel for Plaintiffs-Appellees:

BENBROOK LAW GROUP, P.C.
Bradley A. Benbrook
Stephen M. Duvernay

i

FPC ACTION FOUNDATION
Cody J. Wisniewski

COOPER & SCULLY PC
R. Brent Cooper

4) Counsel for Defendants-Appellants:

United States Department of Justice
Brian M. Boynton
Brigham J. Bowen
Jody D. Lowenstein
Taylor Pitz
Faith E. Lowry

5) *Amici Curiae*:
Palmetto State Armory LLC

Firearms Regulatory Accountability Coalition Inc.

NST Global LLC

6) Counsel for *Amici Curiae*:

WILEY REIN LLP
Stephen Joseph Obermeier
Michael D. Faucette
Jeremy J. Broggi
Boyd Garriott

JOHN LESLIE PLLC
John E. Leslie

*/s/ Bradley A. Benbrook*
Bradley A. Benbrook
*Counsel of Record for
Plaintiffs-Appellees*

## STATEMENT REGARDING ORAL ARGUMENT

Appellees agree with Appellants that the Court should decide this appeal with the benefit of oral argument as it did in the previous appeal in this matter. *Mock v. Garland*, No. 23-10319. The questions presented in this appeal are of critical importance: This case concerns not only the lawfulness of a regulatory action impacting millions of Americans, but also the appropriate scope of relief when a district court holds that a federal agency has violated the Administrative Procedure Act.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS.......................................................... i

STATEMENT REGARDING ORAL ARGUMENT ........................................... iii

TABLE OF CONTENTS ................................................................................... iv

TABLE OF AUTHORITIES................................................................................ vi

INTRODUCTION ............................................................................................... 1

STATEMENT OF THE CASE ............................................................................ 2

I.    Statutory And Regulatory Background ........................................................ 2

II.   Procedural History ...................................................................................... 7

STANDARD OF REVIEW................................................................................ 11

SUMMARY OF THE ARGUMENT ................................................................. 11

ARGUMENT ................................................................................................... 13

I.    The Final Rule Violates The APA Because It Was Not A Logical Outgrowth
      Of The Proposed Rule ............................................................................... 13

      A.    The Law-of-the-Case Doctrine Bars The Agencies' Effort To
            Relitigate This Circuit's Logical Outgrowth Holding ...................... 13

      B.    This Circuit Already Determined Correctly That The Final Rule Is A
            Legislative Rule ............................................................................... 15

      C.    This Circuit Already Correctly Determined That The Final Rule Was
            Not A Logical Outgrowth Of The Proposed Rule ............................ 19

      D.    This Circuit Already Decided That The Agencies' "Monumental Error
            Was Prejudicial" To Plaintiffs ......................................................... 23

II.   The Final Rule Is Arbitrary And Capricious ................................................ 25

      A.    The District Court Correctly Held That The Agencies Failed To
            Provide A Sufficiently Detailed Justification For The Reversal Of
            Their Longstanding Position That Braced Pistols Are Not SBRs ..... 26

      B.    The District Court Correctly Held That The Final Rule's Impossibly
            Vague Standards Render It Arbitrary And Capricious ...................... 32

      C.    Failure To Consider Important Aspects Of Regulation .................... 34

III.    The Judgment May Also Be Affirmed On Multiple Alternative Grounds .. 36

    A.    The Final Rule Is Neither Authorized By Nor Consistent With The NFA ................................................................................................. 36

    B.    The Final Rule Violates The United States Constitution ................... 38

        1.    The Final Rule Violates The Second Amendment ................. 38

            a.    Registration Requirements ........................................... 39

            b.    Taxation Requirements ................................................. 40

        2.    The Final Rule Violates The Constitution's Structural Protections ............................................................................. 41

IV.    The District Court's Vacatur Of The Final Rule Was Proper ..................... 43

    A.    The Anti-Injunction Act Does Not Apply To This Suit .................... 43

    B.    Vacatur Is The Appropriate Remedy Under The APA And The Default Rule In This Circuit ............................................................... 48

        1.    This Is Not A "Rare" Case Where Departure From The "Default" Rule Of Vacatur Is Justified.................................... 48

        2.    Equitable Principles Confirm That Vacatur Is The Appropriate Remedy ............................................................. 50

        3.    Vacatur Appropriately Provides Relief To All Of FPC's Members .............................................................................. 52

V.    If The Court Rejects Plaintiffs' APA Challenge To The Final Rule, Then The Final Rule And The NFA's Regulation Of SBRs Violate The Second Amendment ............................................................................................... 54

CONCLUSION ................................................................................................... 56

CERTIFICATE OF SERVICE............................................................................ 57

CERTIFICATE OF COMPLIANCE .................................................................. 58

# TABLE OF AUTHORITIES

## Cases

*Allina Health Servs. v. Sebelius*,
  746 F.3d 1102 (D.C. Cir. 2014) ................................................... 23, 49

*Am. Great Lakes Ports Ass'n v. Schultz*,
  962 F.3d 510 (D.C. Cir. 2020) ........................................................... 49

*Am. Mining Cong. v. Mine Safety & Health Admin.*,
  995 F.2d 1106 (D.C. Cir. 1993) ......................................................... 17

*Am. Pub. Gas Ass'n v. DOE*,
  72 F.4th 1324 (D.C. Cir. 2023) ......................................................... 24

*Arizona v. California*,
  460 U.S. 605 (1983) .......................................................................... 13

*Braidwood Mgmt., Inc. v. Becerra*,
  104 F.4th 930 (5th Cir. 2024) .............................................. 12, 48, 50

*Caetano v. Massachusetts*,
  577 U.S. 411 (2016) .................................................................... 35, 55

*Campos v. Steves & Sons, Inc.*,
  10 F.4th 515 (5th Cir. 2021) ............................................................. 36

*Cargill v. Barr*,
  502 F. Supp. 3d 1163 (W.D. Tex. 2020) ...................................... 15, 16

*Cargill v. Garland*,
  57 F.4th 447 (5th Cir. 2023) ...................................................... passim

*Chamber of Commerce of United States v. SEC*,
  85 F.4th 760 (5th Cir. 2023) ....................................................... 34, 35

*Chamber of Commerce of United States v. SEC*,
  88 F.4th 1115 (5th Cir. 2023) ..................................................... 48, 49

*Chem. Mfrs. Ass'n v. EPA*,
  870 F.2d 177 (5th Cir. 1989) ............................................................ 19

*CIC Servs., LLC v. IRS*,
  593 U.S. 209 (2021) ............................................................. 44, 46, 47

*City of Waukesha v. EPA*,
  320 F.3d 228 (D.C. Cir. 2003) .......................................................... 24

*Cooper Indus., Ltd. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pennsylvania*,
  876 F.3d 119 (5th Cir. 2017) ............................................................ 36

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
  144 S. Ct. 2440 (2024) ...................................................................... 51

*CSX Transp., Inc. v. Surface Transp. Bd.*,
  584 F.3d 1076 (D.C. Cir. 2009) ...................................................20

*Data Mktg. P'ship, LP v. United States Dep't of Lab.*,
  45 F.4th 846 (5th Cir. 2022) ..............................10, 11, 33, 48

*Deanda v. Becerra*,
  96 F.4th 750 (5th Cir. 2024) .......................................11, 43

*DHS v. Regents of the Univ. of California*,
  591 U.S. 1 (2020) ..........................................................30

*Direct Marketing Ass'n v. Brohl*,
  575 U.S. 1 (2015) ..........................................................45

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) ................................................35, 54

*District of Columbia v. USDA*,
  444 F. Supp. 3d 1 (D.D.C. 2020) ...............................52

*Encino Motorcars, LLC v. Navarro*,
  579 U.S. 211 (2016) ................................................26, 29

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ................................................26, 30

*FCC v. Prometheus Radio Project*,
  592 U.S. 414 (2021) ................................................25, 33

*Feds. For Med. Freedom v. Biden*,
  63 F.4th 366 (5th Cir. 2023) ......................................52

*Franciscan All., Inc. v. Becerra*,
  47 F.4th 368 (5th Cir. 2022) ......................................48

*Friends of the Earth, Inc. v. Chevron Chem. Co.*,
  129 F.3d 826 (5th Cir. 1997) ......................................52

*Gaalla v. Brown*,
  460 F. App'x 469 (5th Cir. 2012) ...........................14, 15

*Guedes v. ATF*,
  920 F.3d 1 (D.C. Cir. 2019) .......................15, 16, 17, 18

*Hardin v. ATF*,
  65 F.4th 895 (6th Cir. 2023) ......................................38

*Huawei Techs. USA, Inc. v. FCC*,
  2 F.4th 421 (5th Cir. 2021) ..............................19, 20, 21

*Hunt v. Wash. State Apple Advertising Comm'n*,
  432 U.S. 333 (1977) ..................................................53

*Kiakombua v. Wolf*,
  498 F. Supp. 3d 1 (D.D.C. 2020) .......................................................51

*Korte v. Sebelius*,
  735 F.3d 654 (7th Cir. 2013) ............................................................43

*Long Island Care at Home, Ltd. v. Coke*,
  551 U.S. 158 (2007)..........................................................................20

*Loving v. United States*,
  517 U.S. 748 (1996)..........................................................................41

*Mock v. Garland*,
  666 F. Supp. 3d 633 (N.D. Tex. 2023) ...............................................7

*Mock v. Garland*,
  75 F.4th 563 (5th Cir. 2023) ..................................................... passim

*Nat'l Ass'n of Manufacturers v. SEC*,
  105 F.4th 802 (5th Cir. 2024) ...........................................................29

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*,
  145 F.3d 1399 (D.C. Cir. 1998) .........................................................50

*New York State Rifle & Pistol Association v. Bruen*,
  597 U.S. 1 (2022)..............................................................2, 38, 39, 41

*Northstar Wireless, LLC v. FCC*,
  38 F.4th 190 (D.C. Cir. 2022) ...........................................................32

*O.A. v. Trump*,
  404 F. Supp. 3d 109 (D.D.C. 2019) ...................................................50

*Organized Vill. of Kake v. USDA*,
  795 F.3d 956 (9th Cir. 2015) ............................................................25

*Pendleton v. Heard*,
  824 F.2d 448 (5th Cir. 1987) ............................................................44

*Porter v. Califano*,
  592 F.2d 770 (5th Cir. 1979) ............................................................38

*R.J. Reynolds Vapor Co. v. FDA*,
  65 F.4th 182 (5th Cir. 2023) ..........................................................9, 52

*Royal Ins. Co. of Am. v. Quinn-L Cap. Corp.*,
  3 F.3d 877 (5th Cir. 1993) .............................................................1, 14

*Smiley v. Citibank (S. Dakota), N.A.*,
  517 U.S. 735 (1996)..........................................................................30

*State v. Biden*,
  10 F.4th 538 (5th Cir. 2021) ............................................................29

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
  600 U.S. 181 (2023) .................................................................................54

*Tex. Pipeline Ass'n v. FERC*,
  661 F.3d 258 (5th Cir. 2011) ..................................................................42

*Texas v. United States*,
  40 F.4th 205 (5th Cir. 2022) ..............................................................47, 52

*Texas v. United States*,
  50 F.4th 498 (5th Cir. 2022) ..............................................................18, 49

*United States v. Bass*,
  404 U.S. 336 (1971) ................................................................................42

*United States v. Lee*,
  358 F.3d 315 (5th Cir. 2004) ..................................................................13

*United States v. Matthews*,
  312 F.3d 652 (5th Cir. 2002) ..................................................................13

*Util. Air Regul. Grp. v. EPA*,
  573 U.S. 302 (2014) ................................................................................42

*VanDerStok v. Garland*,
  86 F.4th 179 (5th Cir. 2023), cert granted, 144 S. Ct. 1390 (2024)...............31, 37

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
  455 U.S. 489 (1982) ............................................................................33, 34

*Wages & White Lion Invs., L.L.C. v. FDA*,
  16 F.4th 1130 (5th Cir. 2021) ............................................................26, 30

*West Virginia v. EPA*,
  597 U.S. 697 (2022) ................................................................................42

*Wright v. New Jersey*,
  469 U.S. 1146 (1985) ..............................................................................33

*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952) ................................................................................41

**Statutes**

18 U.S.C. § 921(a)(30) ...................................................................................3, 37

18 U.S.C. § 921(a)(7) .....................................................................................3, 36

18 U.S.C. § 921(a)(8) .........................................................................................36

26 U.S.C. § 5811(b)............................................................................................44

26 U.S.C. § 5845(a) .............................................................................................3

26 U.S.C. § 5845(a)(3)-(4) ...................................................................................3

26 U.S.C. § 5845(c)................................................................................3, 36

26 U.S.C. § 5845(e)......................................................................................3

26 U.S.C. § 5861(b), (c), (d), (f), (j)..........................................................47

26 U.S.C. § 7421(a)...............................................................................44, 47

26 U.S.C. §§ 5811, 5812..............................................................................3

26 U.S.C. §§ 5871, 5872............................................................................46

5 U.S.C. § 553(b)(3)...................................................................................19

5 U.S.C. § 553(c).........................................................................................19

5 U.S.C. § 706(2)(A)..................................................................................25

5 U.S.C. § 706(2)(B)..................................................................................38

**Other Authorities**

ATF, *Firearms Commerce in the United States – Annual Statistical Update 2021*..5

Letter from John R. Spencer, Firearms Tech. Branch Chief, Bureau of Alcohol, Tobacco, Firearms & Explosives, #3311/2013-0172, (Nov. 26, 2012)................6

U.S. Patent No. 8,869,444 B2 col. 3 ll. 22-23, col. 5 ll. 52-53 (issued Oct. 28, 2014) ...........................................................................................................4

**Treatises**

Wright & Miller, 18B Fed. Prac. & Proc. Juris. § 4478.5 (3d ed.) ........................14

**Regulations**

Factoring Criteria for Firearms with Attached 'Stabilizing Braces', 86 Fed. Reg. 30,826 (June 10, 2021)............................................................................ passim

Factoring Criteria for Firearms with Attached Stabilizing Braces, 88 Fed. Reg. 6,478 (Jan. 31, 2023)............................................................................ passim

**Constitutional Provisions**

U.S. CONST. Art. I, § 1...............................................................................41

U.S. CONST. Art. II, § 3 ............................................................................41

## INTRODUCTION

The resolution of this appeal should be simple. This Court already held that the Department of Justice ("DOJ") and Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF," collectively the "Agencies") violated the Administrative Procedure Act's ("APA") procedural requirements when adopting the Final Rule[1] challenged here. *Mock v. Garland*, 75 F.4th 563, 586 (5th Cir. 2023) ("Mock I"). In the preliminary injunction appeal, this Court catalogued many reasons why the Final Rule cannot stand: It "vests the ATF with complete discretion to use a subjective balancing test to weigh six opaque factors on an invisible scale." *Id.* at 584. The Final Rule's "six-part test provides no meaningful clarity about what constitutes an impermissible stabilizing brace," *id.* at 585, such that "it is nigh impossible for a regular citizen to determine what constitutes a braced pistol," *id.* at 584. And because the Final Rule was not a logical outgrowth of the Proposed Rule,[2] the Agencies violated the APA. The ruling in *Mock I* is binding in this appeal under the law-of-the-case doctrine. *Royal Ins. Co. of Am. v. Quinn-L Cap. Corp.*, 3 F.3d 877, 881 (5th Cir. 1993).

---

[1] Factoring Criteria for Firearms with Attached Stabilizing Braces ("Final Rule"), 88 Fed. Reg. 6,478 (Jan. 31, 2023).

[2] Factoring Criteria for Firearms with Attached 'Stabilizing Braces' ("Proposed Rule"), 86 Fed. Reg. 30,826 (June 10, 2021).

The Final Rule violates the APA in several additional respects. The district court correctly held that the Final Rule is arbitrary and capricious because the Agencies reversed a longstanding position without meaningful explanation and drafted a rule with vague standards. The Final Rule also violates the Second Amendment because it lacks sufficient historical support to survive the test set forth in *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1, 17 (2022). And by legislating where Congress chose not to, the Agencies defied the Constitution's structural protections set forth in the Take Care Clause and articulated in the Delegation Doctrine.

The remedy is also simple. Because the Agencies violated the APA, the district court appropriately vacated the Final Rule. "[V]acatur of an agency action is the default rule in this Circuit." *Cargill v. Garland*, 57 F.4th 447, 472 (5th Cir. 2023) (en banc) (citations omitted). There is no reason to depart from the default rule here.

The district court's judgment should be affirmed.

## STATEMENT OF THE CASE

### I.     Statutory And Regulatory Background.

This Court is familiar with the statutory and regulatory background giving rise to this litigation, which has been recounted extensively in litigation over Plaintiffs' motion for preliminary injunction. *Mock I*, 75 F.4th at 567–77. Plaintiffs briefly restate that background here.

2

The National Firearms Act of 1934 (codified at 26 U.S.C. § 5801 *et seq.*) ("NFA") and the Gun Control Act of 1968 (codified as amended at 18 U.S.C. § 921 *et seq.*) ("GCA") treat handguns and pistols differently from rifles. A "rifle" is defined as "a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder." 26 U.S.C. § 5845(c) (NFA definition); 18 U.S.C. § 921(a)(7) (GCA definition). A short-barreled rifle ("SBR") is "a rifle having a barrel or barrels of less than 16 inches in length; [or] a weapon made from a rifle if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length." 26 U.S.C. § 5845(a). SBRs are regulated under the NFA. *Id.* § 5845(a)(3)-(4). The NFA imposes severe taxes, burdens, delays, and restrictions upon the acquisition, possession, transfer, and lawful use of the arms it regulates. *Id.* §§ 5811, 5812.

Pistols, however, are expressly excluded from NFA restrictions and obligations. 26 U.S.C. § 5845(e). Though "pistol" is not defined in the NFA, the GCA defines a "handgun" as "a firearm which has a short stock and is designed to be held and fired by the use of a single hand." 18 U.S.C. § 921(a)(30).

This case involves the Agencies' attempt to reclassify NFA-exempt pistols with stabilizing braces ("braced pistols") as NFA-regulated SBRs. As recognized by the Agencies, stabilizing braces are designed and intended to assist all people, including those having disabilities or limited strength or mobility, with the safe and

3

comfortable one-handed firing of pistols. *See* Proposed Rule at 30,827 ("[T]he brace concept was inspired by the needs of combat veterans with disabilities who still enjoy recreational shooting but could not reliably control heavy pistols without assistance."). As explained in the patent for the original stabilizing brace, these products "brace" by attaching to the rear of a pistol on the forward end of the brace and wrapping around the wrist or forearm on the rearward end of the brace to "permit[] a user to handle and support a handgun without straining the user's arm, hand, or wrist" by "more evenly distribut[ing]" the weight of the handgun "through the user's hand, wrist, and forearm."[3] Braced pistols are thus *designed* and *intended* to be fired with one hand—and the patent illustrates as much:[4]

---

[3] *See* U.S. Patent No. 8,869,444 B2 col. 3 ll. 22-23, col. 5 ll. 52-53 (issued Oct. 28, 2014), https://tinyurl.com/mr3esfhu.
[4] *Id.*

4



The Final Rule itself demonstrates how stabilizing braces facilitate more secure one-handed firing.[5]



2012 submission of original "stabilizing brace" attached to an AR-type pistol

Before issuing the Proposed Rule and Final Rule, ATF did not treat braced pistols as NFA-regulated SBRs. To the contrary, in 2012, ATF issued a letter ruling

---

[5] Final Rule at 6,483.

in response to the question whether the addition of a brace "would convert a firearm in a manner that would cause it to be classified as a 'rifle' and thus a 'firearm'" under the NFA. Letter from John R. Spencer, Firearms Tech. Branch Chief, Bureau of Alcohol, Tobacco, Firearms & Explosives, #3311/2013-0172, (Nov. 26, 2012), https://tinyurl.com/2z7pz2v6. ATF determined that "the submitted forearm brace, when attached to a firearm, does not convert that weapon to be fired from the shoulder and would not alter the classification of a pistol or other firearm." *Id*. ATF reiterated similar guidance in 2015 and 2017. *See Mock I*, 75 F.3d at 571–72. And in 2019, "ATF asserted in criminal prosecutions that 'ATF letters do correctly state that they consider a firearm with a pistol brace to not be a rifle under the NFA for purposes of the NFA.'" *Id*. at 572 (citation omitted).

The Agencies, at the behest of political pressure, suddenly changed course with the issuance of a Proposed Rule in June 2021 that relied on a worksheet-based system to classify whether a braced firearm would now qualify as a "rifle" under the NFA. *See Mock I*, 75 F.4th at 573–74. The worksheet system assigned point values to certain criteria focused on whether a braced firearm was "intended" for shoulder firing; if this inquiry yielded enough points, the braced pistol would be classified as a rifle. *Id.*

After receiving nearly 220,000 comments criticizing the Proposed Rule, in January 2023 the Agencies issued a Final Rule that took a radically different

approach. The Final Rule erased the line between non-NFA braced pistols and NFA-regulated SBRs. The Final Rule reflected the Agencies' new position that a pistol equipped with a brace "that provides surface area that *allows* the weapon to be fired from the shoulder is a rifle, provided the other factors" identified in the Final Rule "indicate" the braced pistol is "designed, made, and intended to be fired from the shoulder." Final Rule at 6,480 (emphasis added).

Accordingly, the Final Rule amended the federal regulatory definitions of "rifle" to include a six-factor test for determining whether a braced pistol was designed and intended to be fired from the shoulder, and thus was an NFA-regulated "rifle." Final Rule at 6,574–75; *see Mock I*, 75 F.4th at 574 (explaining Final Rule's redefinition of "rifle" and listing factors).

## II.    Procedural History.

Plaintiffs filed this case the day the Agencies published the Final Rule. ROA.23. Plaintiffs quickly filed an Amended Petition, ROA.141, and sought a preliminary injunction and/or a stay of the rule under 5 U.S.C. § 705, ROA.283. The district court denied Plaintiffs' motion. ROA.443; *Mock v. Garland*, 666 F. Supp. 3d 633 (N.D. Tex. 2023). This Court reversed, holding that Plaintiffs had established a likelihood of prevailing on their claim that the Final Rule failed the APA's logical-outgrowth test. *Mock I*, 75 F.4th at 578–86.

On remand, the district court preliminarily enjoined the Agencies from enforcing the Final Rule against Plaintiffs and various related parties. ROA.957. The Agencies appealed, ROA.1187, and that appeal was consolidated with five preliminary injunction appeals from cases throughout the Circuit. No. 23-40556, consolidated with Nos. 23-11157, 23-11199, 23-11203, 23-11204, 23-40685.

While the second preliminary injunction appeal was pending the parties filed cross-motions for summary judgment. ROA.1005, 1193. In June 2024, the district court issued an order: (1) granting Plaintiffs' motion for summary judgment on the grounds that the Final Rule violated the APA's procedural requirements; (2) vacating the Final Rule in its entirety; and (3) denying the Agencies' motion for summary judgment. ROA.1947.

The district court first addressed the Agencies' argument that the Tax Anti-Injunction Act ("AIA") barred Plaintiffs' challenge because the NFA imposes a $200 "transfer tax" on all firearm transactions within its coverage, and the Final Rule would massively expand the NFA's coverage to reach millions of newly regulated braced pistols. ROA.1950. Because the district court elected to vacate the Final Rule, and not enjoin it, the district court decided that the Agencies' AIA argument was moot. ROA.1951.

On the merits of Plaintiffs' APA challenge, the court first held that the Final Rule is not a logical outgrowth of the Proposed Rule. ROA.1951-52. The district

8

court "decline[d] to relitigate a determination made by the Fifth Circuit in this case," and adopted this Circuit's "well-reasoned conclusion as its own." ROA.1952.

Second, the district court then found "that the adaptation of the Final Rule was arbitrary and capricious" for two reasons. First, the Agencies "did not provide a detailed justification for their reversal of the agency's longstanding position." ROA.1953, 1954 (Agencies "provided no explanations for how [they] came to these classifications and there is no 'meaningful clarity about what constitutes an impermissible stabilizing brace'") (quoting *Mock I*, 75 F.4th at 585, *R.J. Reynolds Vapor Co. v. FDA*, 65 F.4th 182, 191 (5th Cir. 2023)). These issues were "further exacerbated by [the Agencies'] failure to follow the APA's procedural requirements for public notice and comment," since "the Proposed Rule and the Final Rule differed in immense ways." ROA.1954.

Third, the court found that "the Final Rule's standards are impermissibly vague": "[T]he Final Rule's six factor test … 'provides no meaningful clarity about what constitutes an impermissible stabilizing brace,' and, thus, that 'it is nigh impossible for a regular citizen to determine what constitutes a braced pistol' that 'requires NFA registration.'" ROA.1955-1956 (quoting *Mock I*, 75 F.4th at 584–85).

Because the APA violations were sufficient to dispose of the case, the district court declined to consider Plaintiffs' additional procedural and constitutional claims.[6] ROA.1956.

Turning to relief, the district court followed the "default rule" in this Circuit and vacated the Final Rule. ROA.1957 (quoting *Data Mktg. P'ship, LP v. United States Dep't of Lab.*, 45 F.4th 846, 859–60 (5th Cir. 2022)). The district court refused the Agencies' request for a remand without vacatur because "[a]n illegitimate agency action is void *ab initio* and therefore cannot be remanded as there is nothing for the agency to justify." ROA.1958. Accordingly, vacatur was appropriate to "re-establish the status quo—that existed for decades prior to the Final Rule going into effect last year—absent the unlawful agency action." ROA.1958 (cleaned up). The court denied Plaintiffs' request for a complementary permanent injunction as "unnecessary." ROA.1958.

The district court entered judgment for Plaintiffs the same day. ROA.1959. This Circuit dismissed the consolidated preliminary injunction appeals after the Agencies filed a notice of appeal from the final judgment in this case. Dismissal Order, *Watterson v. ATF*, No. 23-40556, Dkt. 134-1 (5th Cir. Sept. 26, 2024).

---

[6] *See* § III below.

## STANDARD OF REVIEW

This Court reviews summary judgment de novo and reviews vacatur of a regulation under the APA for abuse of discretion. *See Deanda v. Becerra*, 96 F.4th 750, 755 (5th Cir. 2024); *Data Mktg. P'ship*, 45 F.4th at 853.

## SUMMARY OF THE ARGUMENT

The ruling in *Mock I* is binding in this appeal under the law-of-the-case doctrine. This Circuit already thoroughly considered and rejected each of the Agencies' recycled logical-outgrowth arguments in the preliminary injunction appeal. *Mock I*, 75 F.4th at 578–83 (determining the Final Rule is legislative, not interpretive); *id.* at 583–86 (determining "the Final Rule was not a logical outgrowth of the Proposed Rule, and the monumental error was prejudicial"). This Circuit's prior opinion controls here.

While the logical outgrowth violation is a sufficient basis to uphold the judgment, the Final Rule violates the APA in several additional respects. First, the district court correctly held that the Final Rule is arbitrary and capricious because "the Defendants did not provide a detailed justification for their reversal of the agency's longstanding position," and because "the Final Rule's standards are impermissibly vague." ROA.1953. Second, the Agencies' redefinition of "rifle" to include braced pistols exceeds the Agencies' congressionally limited authority to interpret the NFA. Third, the Final Rule violates the Second Amendment because it

11

lacks sufficient historical support to survive under *Heller* and *Bruen*. And finally, by legislating where Congress chose not to, the Agencies violated both the Delegation Doctrine and the Take Care Clause—core structural protections against administrative overreach.

Because the Agencies violated the APA, the district court acted well within its discretion in vacating the Final Rule. As this Court "ha[s] repeatedly described it, [vacatur is] the 'default' remedy for unlawful agency action." *Braidwood Mgmt., Inc. v. Becerra*, 104 F.4th 930, 952 (5th Cir. 2024) (citations omitted). The Agencies' plea for party-limited relief defies the APA's (and thus Congress's) design and fails to account for the Final Rule's nationwide impact and the integrated nature of the firearms market. This is not the rare case where departure from the default rule is justified.

Alternatively, if this Court were to find the Final Rule to be an appropriate exercise of the Agencies' power, then the NFA's onerous and ahistorical regulation of SBRs, which are commonly possessed by law-abiding individuals for lawful purposes, violates the Second Amendment.

For these reasons, the district court's judgment should be affirmed.

# ARGUMENT

## I.  The Final Rule Violates The APA Because It Was Not A Logical Outgrowth Of The Proposed Rule.

### A.  The Law-of-the-Case Doctrine Bars The Agencies' Effort To Relitigate This Circuit's Logical Outgrowth Holding.

The Agencies spend many pages repeating arguments that this Court rejected in the preliminary injunction appeal. This defies the black-letter rule that this Circuit's prior determination in a preliminary injunction appeal is binding under "[t]he law of the case doctrine," which "posits that ordinarily 'an issue of fact or law decided on appeal may not be reexamined either by the district court on remand or by the appellate court on subsequent appeal.'" *United States v. Lee*, 358 F.3d 315, 320 (5th Cir. 2004) (citation omitted). Put simply, "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case," *Arizona v. California*, 460 U.S. 605, 618 (1983), and it may be disregarded only in certain enumerated "exceptional circumstances," *Lee*, 358 F.3d at 320.[7]

---

[7] A court can depart from the law-of-the-case doctrine where: "(1) The evidence at a subsequent trial is substantially different; (2) there has been an intervening change of law by a controlling authority; and (3) the earlier decision is clearly erroneous and would work a manifest injustice." *United States v. Matthews*, 312 F.3d 652, 657 (5th Cir. 2002). The Agencies have not invoked any of these exceptions, which do not apply here.

This Circuit has long held that law-of-the-case principles have particular force where, as here, legal issues have been decided in a preliminary injunction appeal. *See Royal Ins. Co. of Am.*, 3 F.3d at 881 ("As to decisions of law, the interlocutory appeal [of a preliminary injunction] will establish law of the case."); *Gaalla v. Brown*, 460 F. App'x 469, 476 (5th Cir. 2012) ("[A] decision on interlocutory appeal of the grant of a preliminary injunction constitutes law of the case as to legal determinations."); *see also id.* (collecting similar cases in preliminary injunction context). In short, "[a] fully considered appellate ruling on an issue of law made on a preliminary injunction appeal … does become the law of the case for further proceedings in the trial court on remand and in any subsequent appeal." Wright & Miller, 18B Fed. Prac. & Proc. Juris. § 4478.5 (3d ed.).

The Agencies provide no reason to deviate from the doctrine's application here. The closest the Agencies come to even acknowledging that law-of-the-case applies here is by insisting that the Court's "analysis was preliminary," Br. 14, and suggesting that it "should reassess that conclusion [that Plaintiffs were likely to prevail] and decline to adopt it on final judgment," Br. 17. There was nothing preliminary about this Circuit's conclusions on the two legal questions the Agencies wish to revisit here. *Mock I*, 75 F.4th at 578–83 (determining that the Final Rule is legislative, and not interpretive); *id.* at 583–86 (determining that "the Final Rule was not a logical outgrowth of the Proposed Rule, and the monumental error was

prejudicial"). In any event, even when couched in terms of a "likelihood" (or not) of success, legal findings in that determination remain binding in the absence of new evidence on remand or a change in controlling authority, neither of which exist here. *See Gaalla*, 460 Fed. App'x. at 476 (prior preliminary injunction appeal found absence of a likelihood of success that remained binding as to legal conclusions). This Circuit's prior rulings on the logical outgrowth violation are binding here.

### B.  This Circuit Already Determined Correctly That The Final Rule Is A Legislative Rule.

The Agencies first ask the Court to reconsider its detailed analysis and determination that the Final Rule is a legislative rule, not interpretive. *Mock I*, 75 F.4th at 578–83. They start by repackaging previous arguments. *Compare* Br. 18–20 *with* Appellees' Br., No 23-10319 (Dkt. 117-1), at 15–16, 27–28. This Circuit's prior determination is binding. It adopted the five factors identified by the district court in *Cargill v. Barr*, 502 F. Supp. 3d 1163, 1184 (W.D. Tex. 2020), which in turn borrowed from the D.C. Circuit's approach in *Guedes v. ATF*, 920 F.3d 1, 17–20 (D.C. Cir. 2019). *Mock I*, 75 F.4th at 579–80. Applying this framework, this Circuit reasoned that "[t]he factors as a whole indicate that the Final Rule is a legislative rule." *Id.* at 580–83.

The Agencies, however, quibble with this Circuit's mode of analysis. Br. 21–24. None of their arguments merit disturbing the prior determination.

15

First, the Agencies argue that "the bottom-line question that a court must answer is 'whether the agency intended to speak with the force of law,'" whereas *Mock I* listed this question as one of five factors. Br. 21–22 (quoting *Guedes*, 920 F.3d at 18). Even indulging the Agencies' critique, *Mock I* already dispensed with the so-called "bottom-line question" at length. All relevant "indicators" showing that ATF "intended to speak with the force of law" "are present in the Final Rule": Through "prospective, binding language," the Agencies sought to "directly govern[] the conduct of members of the public, affecting individual rights and obligations." 75 F.4th at 581 (quoting *Cargill v. Barr*, 502 F. Supp. 3d at 1184; *Guedes*, 920 F.3d at 18). The Final Rule informs braced pistol owners of their options to avoid NFA violations, provides direction on how to avoid criminal enforcement, and establishes a compliance timeframe. *Id*. Just as in *Guedes*, ATF's language here is "powerful evidence that the Bureau 'intended [the Rule] as a binding application of its rulemaking authority.'" 920 F.3d at 18 (citation omitted).

Indeed, the Agencies' argument is curious since it is predicated on language from *Guedes*, but *Mock I* relied heavily on the similarities between this case and *Guedes*. 75 F.4th at 580–81. Indeed, ATF attempted a virtually identical gambit in *Guedes*—that is, recasting a final rule as "interpretive" by taking litigation positions that defied the actual language of the regulation. Much like the Final Rule here sought to change the regulatory landscape by declaring that 99% of all braced pistols

were "short-barreled rifles" under the NFA, the rule at issue in *Guedes* purported to declare that every semiautomatic weapon equipped with a bump stock was a "machinegun" under the GCA and NFA. The overlaps abound.[8]

The D.C. Circuit rejected this ploy: "[T]he government cannot now, in litigation, reconceive the Bump-Stock Rule as an interpretive rule. The character of a rule depends on the agency's intent when issuing it, not on counsel's description of the rule during subsequent litigation." *Guedes*, 920 F.3d at 20. This Circuit rightly rejected a similar revisionist effort here:

> Although the government has been more circumspect here [than in *Guedes*], the overall implication and conclusion are the same. Before the Final Rule, the ATF would not prosecute an individual for owning a braced pistol. There was no indication that persons or organizations acted unlawfully before the Final Rule's publication by possessing or transferring a braced pistol. Post-Final Rule, the government has attempted to claim that the stabilizing braces were always unlawful— but that is flatly unpersuasive given the history of ATF regulation and action. The character of the rule is legislative.

*Mock I*, 75 F.4th at 582. This Court should reiterate that conclusion here.

---

[8] To note two additional examples, ATF invoked the same delegations of legislative authority in *Guedes*, 920 F.3d at 19, that it cited here, Final Rule at 6,481. *Cf. Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1112 (D.C. Cir. 1993) (when agency "explicitly invoke[s] its general legislative authority, … we have a legislative, not an interpretive rule"). And ATF claimed it was merely engaging in "discretionary withholding of enforcement" in *Guedes* by not prosecuting possessors of bump stocks prior to the rule's effective date, 920 F.3d at 20; it claims here that the Final Rule's "compliance options … reflect exercises of the agency's 'own enforcement discretion[,]'" Br. 22.

The Agencies make a few additional minor points taking issue with this Circuit's consideration of the remaining factors. They argue that the Final Rule's publication in the Code of Federal Regulations ("C.F.R.") does not "bear much weight," Br. 23, but they cannot dispute that it is a *relevant* consideration. Indeed, the APA instructs that "publication in the [C.F.R.] is limited to rules 'having general applicability and *legal effect.*'" *Guedes*, 920 F.3d at 19 (citation omitted). The Final Rule's extensive amendments to the C.F.R.'s definition of "rifle" to sweep in braced pistols "'would be highly unusual for a mere interpretive rule.'" *Mock I*, 75 F.4th at 580 (quoting *Guedes*, 920 F.3d at 19).

Finally, the Agencies downplay the significance of the Final Rule's impact on private interests by focusing solely on its economic impact. Br. 24. But the substantial-impact test looks more broadly on a regulation's impacts on private interests. *See, e.g.*, *Texas v. United States*, 50 F.4th 498, 523 (5th Cir. 2022) (DACA benefits, including work authorization and eligibility for social services, constitute "significant effects on private interests"). And this Court already explained that the "[substantial-impact] test strongly favors determining the Final Rule to be legislative" given its economic impact and the criminal consequences for noncompliance with a Rule that ATF asserts has retroactive effect. *Mock I*, 75 F.4th at 581–82.

As this Circuit has already recognized, the Final Rule is a legislative rule subject to the APA's notice-and-comment requirements.

### C. This Circuit Already Correctly Determined That The Final Rule Was Not A Logical Outgrowth Of The Proposed Rule.

The Agencies next seek to relitigate this Circuit's determination that the Final Rule is not a logical outgrowth of the Proposed Rule by repurposing unsuccessful arguments from the prior appeal. *Compare* Br. 25–26 *with* Appellees' Br., No 23-10319 (Dkt. 117-1), at 29–30. This Circuit's prior determination—which applies the same legal framework identified in the Agencies' brief—is binding. *See Mock I*, 75 F.4th at 583 (citing *Chem. Mfrs. Ass'n v. EPA*, 870 F.2d 177, 203 (5th Cir. 1989), and *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 447 (5th Cir. 2021)). The Agencies' disagreement with that analysis, Br. 29–31, is no basis to depart from the law of the case.

The APA requires federal agencies to provide the public with a meaningful opportunity to comment on the elements of proposed rules and the supporting materials. *See, e.g.*, 5 U.S.C. § 553(c). The APA ensures this by requiring that whenever an agency seeks to promulgate, amend, or repeal a regulation it must issue a notice of proposed rulemaking that includes, *inter alia*, "either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b)(3). A corollary of this requirement is that "the final rule the agency adopts must be a logical outgrowth of the rule proposed." *Long Island Care at Home,*

*Ltd. v. Coke*, 551 U.S. 158, 174 (2007) (cleaned up). The baseline is that a notice of proposed rulemaking is inadequate if it does not "indicate[] that the [agency] was contemplating a particular change" that appears in the final rule. *CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1081–82 (D.C. Cir. 2009). Adequate notice ensures that those who will be affected can "anticipate[] the agency's final course." *Huawei*, 2 F.4th at 447 (cleaned up).

In short, under the logical-outgrowth rule, a proposed rule "must 'adequately frame the subjects for discussion such that the affected party should have anticipated the agency's final course in light of the initial notice.'" *Mock I*, 75 F.4th at 583 (citation omitted). Here, the Proposed Rule did no such thing:

> [T]he fatal flaw is conceptual: Whereas the Worksheet allowed an individual to analyze his own weapon and gave each individual an objective basis to disagree with the ATF's determinations, the Final Rule vests the ATF with complete discretion to use a subjective balancing test to weigh six opaque factors on an invisible scale.

*Id.* at 584.

Arguably, the change was even more stark. While the Agencies argue that "both" the Proposed Rule and Final Rule "adopt an approach that makes an individualized assessment of a particular firearm," Br. 29, the record tells a different story. ATF professed in the Proposed Rule to have an open mind in the application of its worksheet criteria to determine whether braced pistols were covered by the NFA. *See, e.g.*, Proposed Rule at 30,828. The worksheet was designed "to allow

individuals of members of the firearms industry to evaluate whether" their braced pistols would be considered an SBR. *Id*. Indeed, ATF provided three examples showing how the worksheet would yield different results for different configurations: in one, the AR-type Firearm with an "SB-Mini Accessory" was deemed a pistol, rather than an SBR. *Id.*, 30,834–36.

The Final Rule, however, announced that 99% of the millions of braced pistols in America were SBRs, and their owners would be felons if they did not register, surrender, or destroy them. *Mock I*, 75 F.4th at 574. As for the popular "AR-type firearm with an SB-Mini accessory, determined to be a braced pistol under the Proposed Rule, [it] now appears to be adjudicated as an SBR under the Final Rule." *Id.* at 575.

The rulemaking here is thus distinguishable from the situation in *Huawei*, where the FCC's proposed rule clearly alerted the regulated community to the scope of the changes it was considering. 2 F.4th at 448. Indeed, the FCC's final regulation not only responded to the plaintiff's comments, it "adopt[ed] the kind of process [plaintiff] commented was absent from the proposed rule." *Id.* That is a far cry from the drastic change in course charted in the Final Rule.

The Agencies claim the Final Rule's pivot to a subjective test "did not generate a fair notice problem" primarily because some commenters complained the Proposed Rule's worksheet-based system was arbitrary and subjective. Br. 29–30.

This ignores a core flaw this Circuit highlighted in *Mock I*: Even if the Proposed Rule was flawed, that does not mean that "commentators could have reasonably anticipated" the Final Rule's sweeping changes. *Mock I*, 75 F.4th at 584. "[N]owhere in the Proposed Rule did the ATF give notice that it was considering getting rid of the Worksheet for a vaguer test," as "the 'Comments Sought' section of the Proposed Rule requested only 'additional criteria that should be considered' and comments on whether ATF 'selected the most appropriate criteria.'" *Id.* Nor did anything stop the Agencies from amending and re-noticing a proposed rule, instead of plowing ahead with a dramatically altered final rule.

The Agencies also claim this Circuit's determination that two new "requirements involving analysis of third parties' actions," *Mock I*, 75 F.4th at 585, proceeds from an "erroneous premise" that these factors were not in the Proposed Rule. Br. 30. Yet the Agencies immediately acknowledge that "those factors did not appear on the worksheet," *id.*, the centerpiece of the Proposed Rule. The Agencies point to the Proposed Rule's statement that "efforts to advertise, sell or otherwise distribute 'short barreled rifles' *as such* will result in a classification" as an SBR, since "there is no longer any question" about the manufacturer's intent. Proposed Rule at 30,834. This is hardly a controversial notion when advertising leaves no question that a weapon is "intended to be fired from the shoulder." But that is far from the same as declaring all less-categorical advertising will now also be

considered. And the Agencies point to nothing in the Proposed Rule alerting the public that third parties' conduct—including YouTubers' video demonstrations—would inform the classification. As the Court recognized, this significant expansion poses the risk that the Agencies "would hold citizens criminally liable for the actions of others, who are likely unknown, unaffiliated, and uncontrollable by the person being regulated." *Mock I*, 75 F.4th at 585, 586.

Finally, it bears noting that the dramatic change in economic impact between the Proposed Rule (with an estimated annualized cost of $114.7 million) to the Final Rule (estimated annualized cost of $245.6 million) underscores the Court's logical-outgrowth conclusion. *See Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1108 (D.C. Cir. 2014). Such a massive increase in the economic impact on the regulated community is a strong signal that the Final Rule is not a logical outgrowth of the Proposed Rule.

### D.   This Circuit Already Decided That The Agencies' "Monumental Error Was Prejudicial" To Plaintiffs.

Finally, the Agencies argue that Plaintiffs failed to demonstrate sufficient prejudice to warrant relief under the APA. Br. 31. The Agencies again repackage an argument they made at the preliminary injunction stage. *Compare* Br. 31 *with* Appellees' Br., No 23-10319 (Dkt. 117-1), at 30–31. This Circuit has already considered and expressly decided this issue, holding that Plaintiffs did not need to

show party-specific prejudice in a logical-outgrowth case and, in any event, that Plaintiffs had shown sufficient prejudice here. *Mock I*, 75 F.4th at 586 & n.58.

Specifically, the Court held that "plaintiffs have easily proven that" they suffered prejudice because "they could not comment on the specifics of the Final Rule, given how vastly different the Proposed and Final Rule turned out. As a result, plaintiffs were not on notice, nor could they comment on the expanded rule." *Id.* at 586. Not only had "plaintiffs … suggested, through briefing, a number of comments they would have liked to have made against the Final Rule," the Court found that a stringent prejudice requirement in logical outgrowth cases makes little sense given the nature of the government's action:

> [T]here are also situations where prejudice need not be shown by petitioners in a notice-and-comment rulemaking challenge, "where the agency has entirely failed to comply with notice-and-comment requirements, and the agency has offered no persuasive evidence that possible objections to its final rules have been given sufficient consideration" … . [A] rule requiring petitioners in all "logical outgrowth" cases to show what additional comments they would have submitted had notice been adequate would improperly merge the analysis on the merits of whether the final rule is a "logical outgrowth" with any applicable prejudice analysis.

*Id.* at 586 n.58 (quoting *City of Waukesha v. EPA*, 320 F.3d 228, 246 (D.C. Cir. 2003)).

This is consistent with the general rule that "[p]etitioners do not have a high burden in demonstrating 'prejudice in notice-and-comment cases.'" *Am. Pub. Gas Ass'n v. DOE*, 72 F.4th 1324, 1338–39 (D.C. Cir. 2023); *see, e.g., U.S. Steel Corp.*

*v. EPA*, 595 F.2d 207, 215 (5th Cir. 1979) (harmless error does not apply where "the Agency's error plainly affected the procedure used, and we cannot assume that there was no prejudice to petitioners"); *Organized Vill. of Kake v. USDA*, 795 F.3d 956, 969 (9th Cir. 2015) (prejudice requirement is not "particularly onerous," and "[i]f prejudice is obvious to the court, the party challenging agency action need not demonstrate anything further" (citations omitted)).

In sum, this Circuit already rejected the precise argument that the Agencies recycle in their opening brief.

## II.    The Final Rule Is Arbitrary And Capricious.

The APA provides that a reviewing court shall set aside agency action that is "arbitrary, capricious, … or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A). The "arbitrary-and-capricious standard requires that agency action be [both] reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). The district court correctly held that the Final Rule is arbitrary and capricious because "the Defendants did not provide a detailed justification for their reversal of the agency's longstanding position," and because "the Final Rule's standards are impermissibly vague." ROA.1953. This Court should uphold that decision.

**A.** **The District Court Correctly Held That The Agencies Failed To Provide A Sufficiently Detailed Justification For The Reversal Of Their Longstanding Position That Braced Pistols Are Not SBRs.**

The district court concluded that the Agencies "inexplicably and fundamentally switched their position on stabilizing braces without providing sufficient explanations and notice." ROA.1954. "When an agency changes its existing position, it … must at least display awareness that it is changing position and show that there are good reasons for the new policy." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016) (quotation omitted); *see also id.* at 222 (an "unexplained inconsistency in agency policy is a reason for holding an [action] to be an arbitrary and capricious change from agency practice" (quotation omitted)). And an agency must provide a more "detailed justification" for a "new policy [that] rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests that must be taken into account." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (citation omitted); *see Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1139 (5th Cir. 2021).

The Agencies argue that the explanation needed here was minimal: all the Final Rule had to do was "display awareness that" the Final Rule reflected a shift in the Agencies' prior position and to articulate "good reasons for" the Final Rule's approach. Br. 36 (quoting *Fox Television Stations*). But this argument is premised

on the Agencies' assurances that the Final Rule represented only a minimal change. Indeed, the Agencies argue there was no "fundamental shift" in the Final Rule because ATF had always made "case-by-case" determinations such that the agency "understood that the majority of braced firearms are likely to be short-barreled rifles." Br. 34, 35. As the district court explained, however:

> For close to a decade, the ATF concluded that "attaching the brace to a firearm does not alter the classification of the firearm or subject the firearm to NFA control." The ATF changed course on this position for the first time in 2023, when it issued the Final Rule reversing the agency's otherwise long-standing policy. … [¶] Under the Final Rule, the ATF estimated about 99% of pistols with stabilizing braces would be reclassified as NFA rifles.

ROA.1953-1954. Thus, as this Circuit recognized, the public was not "put on notice that not only would ATF change the criteria, but it also would make the criteria so expansive as to subject an estimated 99% of stabilizing braces on the market to enhanced regulations and increase the economic effect of the Rule by over $100 million." *Mock I*, 75 F.th at 583–84.

Nevertheless, the Agencies seize (Br. 34–35) on the Final Rule's statements that ATF had allegedly always considered "a majority" of braced pistols to be SBRs. Final Rule at 6,480. ATF's own history of classification letters demonstrates, however, that this is not the case: The agency analyzed numerous braced pistols over a decade and determined that they were not subject to the NFA. *See id.*, 6,482–93

27

(reviewing ATF classifications decisions and advisory letters, including 11 decisions classifying stabilizing brace designs as outside the NFA).

As for its characterization of future regulation after the Final Rule, the so-called "majority" figure suddenly became *99% of all braced pistols*. When 99% of the millions of braced pistols are classified as SBRs, the Final Rule cannot be taken seriously when it assures that it affects no major change because determinations will still be made on a "case-by-case" basis. *See* Br. 35; Final Rule at 6,495. Indeed, as the district court emphasized:

> The ATF contemporaneously issued approximately sixty adjudications pursuant to the Final Rule that *reclassified* different configurations of firearms with stabilizing braces as NFA rifles. The ATF provided no explanations for how the agency came to these classifications and there is no "meaningful clarity about what constitutes an impermissible stabilizing brace." In fact, the Fifth Circuit "[could not] find a single given example of a pistol with a stabilizing brace that would constitute an NFA-exempt braced pistol."

ROA.1954 (quoting *Mock I*, 75 F.4th at 585) (emphasis added).

Moreover, the Final Rule's explanation for the purportedly minor change was wholly conclusory. *See*, *e.g.*, Final Rule at 6,481 (contending that it "prevent[s] manufacturers and individuals from violating the requirements of the NFA and GCA"). And although the Agencies argue that the Final Rule's departure from ATF's previous position is justified because of inconsistencies in earlier classification letters, Br. 35, and claim that the Final Rule promotes "regulatory clarity," Br. 36, this after-the-fact litigation position ignores that the Final Rule *itself*

does not provide a sufficient justification for its reversal of the Agencies'
longstanding position. "[A]n agency must provide 'a more detailed justification'
when a 'new policy rests upon factual findings that contradict those which underlay
its prior policy.'" *State v. Biden*, 10 F.4th 538, 554 (5th Cir. 2021) (citation omitted)).
And "[a]n agency's failure to explain its decision to 'disregard[ ] facts … that
underlay … the prior policy' is arbitrary and capricious." *Nat'l Ass'n of
Manufacturers v. SEC*, 105 F.4th 802, 811 (5th Cir. 2024) (citation omitted).

The Supreme Court's approach in *Encino Motorcars* is instructive. It held that
the Department of Labor's ("DOL") reversal of a decades-long policy was arbitrary
and capricious because the agency failed to provide a sufficiently "reasoned
explanation … in light of the Department's change in position and the significant
reliance interests involved." 579 U.S. at 222. The agency argued that its position was
more consistent with statutory language but it didn't provide a reasoned factual basis
for abandoning its previous interpretation. Similar to ATF's approach here, the DOL
asserted that it "believes that this interpretation [of the statute] is reasonable" and
"set[] forth the appropriate approach." 579 U.S. at 223. The Court rejected these
"conclusory statements" as insufficient because the agency "did not analyze or
explain why the statute should be interpreted" as the agency insisted given its
"longstanding earlier position." *Id.* at 224.

29

So too here. The Agencies cannot "turn[] around and ignore[]" a previous position without explaining the "'factual findings that contradict those which underlay its prior policy.'" *Wages & White Lion*, 16 F.4th at 1139 (quoting *Fox Television Stations*, 556 U.S. at 515). The Agencies' failure to provide a reasoned factual explanation for its new policy renders its regulatory about-face arbitrary and capricious.

The Agencies' sudden and radical change further supports an arbitrary and capricious finding because they did "not take account of legitimate reliance on prior interpretation." *Smiley v. Citibank (S. Dakota), N.A.*, 517 U.S. 735, 742 (1996). "When an agency changes course … it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *DHS v. Regents of the Univ. of California*, 591 U.S. 1, 30 (2020) (cleaned up).

Here, the Final Rule fails to account for its impact on the millions of Americans who own braced pistols that would now be subject to the NFA's harsh restrictions. The Final Rule is not merely a regulation of the firearms market, but instead directly (and retroactively) impacts the existing owners of millions of braced pistols. The record demonstrates that ATF's "prior policy has engendered serious reliance interests," which therefore "must be taken into account" when the agency changes course. *Fox Television Stations*, 556 U.S. at 515. In *VanDerStok*, Judge

30

Oldham highlighted that reliance interests on past agency practices are particularly acute in the firearm context:

> [L]aw-abiding Americans (and the law-abiding gun companies that serve them) rely on longstanding regulatory certainty to avoid falling afoul of federal gun laws. But if ATF can destroy that certainty, it hopes law-abiding Americans will abandon tradition rather than risk the ruinous felony prosecutions that come with violating the new, nebulous, impossible-to-predict Final Rule.

*VanDerStok v. Garland*, 86 F.4th 179, 197 (5th Cir. 2023) (Oldham, J., concurring).[9]

The Final Rule also failed to consider substantial noneconomic reliance interests. Most notably, the Final Rule does nothing to address the impact on the Second Amendment protected rights of those who possessed stabilizing braces and braced pistols based on ATF's longstanding and consistent determinations that they were not subject to the NFA. The Final Rule brushes this aside, claiming in conclusory fashion that "the alleged reliance interest is minimal" because of "the options provided for compliance with the relevant statutes." 88 Fed. Reg. 6,508. These "options" for "compliance," of course, functionally eviscerate the regulated community's reliance interest: They were told to either comply with the NFA (and all of its attendant regulatory burdens) or modify, surrender, or destroy their property.

---

[9] *Cert. granted*, 144 S. Ct. 1390 (2024).

**B.    The District Court Correctly Held That The Final Rule's Impossibly Vague Standards Render It Arbitrary And Capricious.**

The Agencies next argue that the Final Rule's "qualitative balancing test" is not impermissibly vague. Br. 37–39. While it may be true that an agency is "free to apply 'multifaceted considerations'" and adopt a "multi-factor balancing test," Br. 37–38, both the district court and this Court have explained how the Final Rule's vague standards are problematic.

> While the Worksheet in the Proposed Rule would allow "an individual to analyze his own weapon and gave each individual an objective basis to disagree with the ATF's determinations, the Final Rule vests the ATF with complete discretion to use a subjective balancing test to weigh six opaque factors on an invisible scale."

ROA.1955 (quoting *Mock I*, 75 F.4th at 584). The Final Rule's "six-part test provides no meaningful clarity about what constitutes an impermissible stabilizing brace," such that "it is nigh impossible for a regular citizen to determine what constitutes a braced pistol." ROA.1955-56 (quoting *Mock I*, 75 F.4th at 584). It thus lacks the "comprehensible and actionable guidance about the standards" that the Agencies acknowledge must accompany multi-factored balancing tests. Br. 37–38 (citing *Northstar Wireless, LLC v. FCC*, 38 F.4th 190, 218–19 (D.C. Cir. 2022)).

This Court highlighted yet another reason confirming why the Final Rule cannot survive arbitrary-and-capricious review: "The agency maintains that its six-factor test objectively assesses 'design features common to rifles.' But it simultaneously declares that the objective criteria given to assess certain factors 'are

not themselves determinative … .'" *Mock I*, 75 F.4th at 585 (quoting Final Rule at 6,518). This is the essence of arbitrariness: The Agencies claim to set out a test so people can determine for themselves, but do not explain how the factors will be applied and purport to retain discretion to apply separate, unidentified criteria as ATF in its sole discretion deems appropriate.

The Final Rule's factors inexplicably lack precision and allow ATF to cherry-pick third parties' actions in its subjective and discretionary analysis that is required to be based upon the statutory criteria of shouldering. Accordingly, the Agencies did not "act[] within a zone of reasonableness," *Prometheus Radio Project*, 592 U.S. at 423, and "evince[] 'a clear error of judgment,'" *Data Mktg. P'ship*, 45 F.4th at 855–56 (citation omitted).

Furthermore, the Final Rule's criminal consequences heighten the need for clarity. "Where a statute imposes criminal penalties the required standard of certainty is high, and a statute that does not satisfy this requirement may be invalidated on its face 'even where it could conceivably have … some valid application.'" *Wright v. New Jersey*, 469 U.S. 1146, 1152 (1985) (citation omitted). Clarity is essential in this instance because the Final Rule "threatens to inhibit the exercise" of Second Amendment protected rights. *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982).

The Agencies claim the district court "addressed the [Final] Rule's asserted vagueness in a vacuum," and faults the court below for failing to "identify any specific braced firearm for which it is unclear how the statute and [Final] Rule might apply." Br. 39. How could it, when the Final Rule declares that its new standards effectively cover every braced pistol? The Agencies cannot use the Final Rule's vague and overbroad standards to claim that there is no confusion because all braced pistols now fall within the NFA's reach.

The Agencies go so far as to argue that vagueness concerns are ameliorated because parties could "resort to an administrative process" by asking ATF for a classification determination. Br. 39 (quoting *Hoffman Estates*, 455 U.S. at 498). *Hoffman Estates*, however, cuts in favor of Plaintiffs: The Supreme Court noted that, in contrast to economic regulation, vague laws that impose criminal penalties—as is the case with the Final Rule—are of particular concern because of the potential for severe consequences. 455 U.S. at 498–99.

### C.    Failure To Consider Important Aspects Of Regulation.

The Final Rule also flunks arbitrary-and-capricious review because the Agencies did not adequately consider important aspects of the regulation. An agency "must show that it has 'reasonably considered the relevant issues and reasonably explained the decision.'" *Chamber of Commerce of United States v. SEC*, 85 F.4th 760, 774 (5th Cir. 2023) (citation omitted). This standard "requires the agency to

consider all relevant factors raised by the public comments and provide a response to significant points within." *Id.* (citation omitted). The Agencies fell short in two key respects.

First, the Agencies did not adequately address the various ways in which the Final Rule harms disabled individuals seeking to exercise their Second Amendment protected rights. Stabilizing braces have been enormously helpful to those with physical disabilities. And while the Final Rule claims that it does not violate the Americans with Disabilities Act, its focus on the narrow legal issue of the ADA instead of the overall impact on physically disabled individuals gives lip service to the statutory rights of disabled Americans without actually considering how they will be directly impacted by the Rule. *See* Final Rule at 6,508–6,509.

Second, the Final Rule fails to adequately consider the Supreme Court's opinions in *District of Columbia v. Heller*, 554 U.S. 570 (2008); *Caetano v. Massachusetts*, 577 U.S. 411 (2016); and *Bruen*. In promulgating a Final Rule that directly impacts constitutionally protected firearms that are in common use, the Agencies should have engaged in the text-and-history analysis required by *Heller* and *Bruen*. Instead, the Final Rule merely acknowledges *Bruen*. And, as Plaintiffs demonstrate below, the Final Rule violates the Second Amendment.

## III.    The Judgment May Also Be Affirmed On Multiple Alternative Grounds.

Because the APA violations addressed above were sufficient to decide the case, the district court declined to reach the remaining counts in Plaintiffs' First Amended Petition and Complaint. ROA.1956. This Court, however, can affirm the District Court's vacatur on any grounds properly before it. *Campos v. Steves & Sons, Inc.*, 10 F.4th 515, 520 (5th Cir. 2021).[10]

### A.    The Final Rule Is Neither Authorized By Nor Consistent With The NFA.

The Final Rule's redefinition of "rifle" to encompass what the NFA's plain terms exclude exceeds the Agencies' congressionally established authority. The NFA defines a "rifle" as a "weapon designed or redesigned, made or remade, and intended to be fired from the shoulder." 26 U.S.C. § 5845(c). The GCA has a nearly identical definition. 18 U.S.C. § 921(a)(7). An SBR is defined as "a rifle having one or more barrels less than sixteen inches in length and any weapon made from a rifle … if such weapon … has an overall length of less than twenty-six inches." 18 U.S.C. § 921(a)(8). ATF lacks authority to treat braced pistols as rifles because they *per se* do not fit these statutory definitions.

---

[10] Plaintiffs' raising of these arguments also preserves them on appeal. *Cooper Indus., Ltd. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pennsylvania*, 876 F.3d 119, 126–27 (5th Cir. 2017).

A braced pistol—like any other handgun—is "designed" and "made" to be fired by a single hand. The GCA defines a "handgun" in relevant part as "a firearm which has a short stock and is designed to be held and fired by the use of a single hand." 18 U.S.C. § 921(a)(30). The very point of a stabilizing brace is to *facilitate* one-handed operation of a pistol. That the brace is designed to attach to the forearm belies any suggestion that braced pistols are designed to be fired from the shoulder, even if a brace *might* be fired from the shoulder contrary to its design. Indeed, the *possibility* of shoulder-firing no more makes a braced pistol a rifle than does the potential to fire a true rifle with one hand convert it into a pistol.

The Final Rule's multi-factor analysis removes it even further from the statutory text, especially where it relies on criteria that do not bear on the question whether a braced pistol is "designed," "made," and "intended" for shoulder firing. Because braced pistols are designed to facilitate one-handed firing, the plain text of the NFA unambiguously excludes braced pistols. "Where the statutory text does not support ATF's proposed alterations, ATF cannot step into Congress's shoes and rewrite its words," because "the heavy burden [of determining the nation's public policy] falls squarely on Congress." *VanDerStok*, 86 F.4th at 195.

These issues are magnified because the Final Rule carries criminal penalties. "Only Congress can actually criminalize behavior." *VanDerStok*, 86 F.4th at 196.

The rule of lenity forbids agency efforts to rewrite and expand criminal statutes. *Cargill*, 57 F.4th at 469–72.

Finally, that the Final Rule reverses the Agencies' longstanding position is further evidence that the Agencies exceeded their statutory authority. *See Hardin v. ATF*, 65 F.4th 895, 898 (6th Cir. 2023); *Cargill*, 57 F.4th at 468.

### B.     The Final Rule Violates The United States Constitution.

A violation of the Constitution is always a violation of the APA. Courts must set aside agency action that is "contrary to constitutional right [or] power." 5 U.S.C. § 706(2)(B). "The intent of Congress in 5 U.S.C. § 706(2)(B) was that courts should make an independent assessment of a citizen's claim of constitutional right when reviewing agency decision-making." *Porter v. Califano*, 592 F.2d 770, 780 (5th Cir. 1979).

### 1.     The Final Rule Violates The Second Amendment.

When, as here, "the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government … must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17.

There is no serious question that the Final Rule regulates conduct—keeping and bearing braced pistols for lawful purposes—that falls within the plain text of the

Second Amendment. *See Mock I*, 75 F.4th at 588 (Willett, J., concurring).[11] Under *Bruen*, the Agencies therefore bear the burden of proving that the Final Rule is "consistent with this Nation's historical tradition of firearm regulation." 597 U.S. at 17. The Agencies have not done so and cannot do so.

### a.    Registration Requirements.

The Agencies attempted below to analogize the Final Rule to a handful of laws that they claimed established a historical principle of firearm registration. This includes six Colonial Era militia regulations that fail both *Bruen*'s "how" and "why" metrics. ROA.1247. Taking a survey of what arms and ammunition Colonialists already possess or inspecting militia members' arms to ensure their proper function is different in kind than the NFA's gatekeeping restrictions on the possession of regulated arms. And these laws were directed at ensuring that colonial militia were adequately and appropriately armed, not at dissuading individuals from acquiring

---

[11] Before the district court, the Agencies attempted to evade this commonsense conclusion with two theories. First, they claimed that firearm "accessories" or "attachments" like stabilizing braces are not protected by the Second Amendment's text. This ignores the fact that the Final Rule regulates firearms, not just components. Regardless, to regulate any firearm component or accessory (such as a magazine or barrel) is to regulate the firearm itself. The constitutional text "covers modern instruments that *facilitate* armed self-defense." *Bruen*, 597 U.S. at 29. Second, the Agencies claimed that braced pistols are "dangerous and unusual" weapons outside of the Second Amendment's protection. This argument skips ahead to the historical analysis, which assumes the conduct is covered by the text. In any event, the more than 3 million braced pistols are in common use for lawful purposes, so by definition, they are not "dangerous and unusual." *Id.* at 47.

certain arms. The Final Rule and NFA are explicitly designed to disarm or heavily regulate a particular class of firearm that the government disfavors.

The Agencies also identified two "proving" laws, ROA.1248, but these laws imposed a far lesser burden on Second Amendment protected rights than the Final Rule and NFA: They did not prescribe any particular features or specifications, but ensured only that firearms operated as intended.

The Agencies further demonstrated how bare the historical record is by turning to four colonial laws restricting the sale of firearms and ammunition to Native Americans. ROA.1248. These discriminatory laws do nothing to show that the Final Rule is consistent with the Nation's historical tradition of firearm regulation.

### b. Taxation Requirements.

The historical regulations the Agencies attempted to analogize as a "tradition" of taxation fare no better. ROA.1249-1250. Regulations on the inspection and sale of gunpowder—designed to ensure basic quality and guard against fire—have nothing in common with the Final Rule. So too with a handful of 19th century laws imposing taxes on certain firearms: These outlier laws do not impose "comparable burdens" to the Final Rule's reclassification of braced pistols, which subject owners to the NFA's ahistorical restrictions.

40

The Agencies also identified several post-Reconstruction laws imposing occupational taxes or licensing fees on firearms businesses. ROA.1250. *Bruen* casts serious doubt on the utility of such late-19th-century sources. 597 U.S. at 36–37, 66. Even so, little needs to be said about these regulations: Laws imposing commercial operating taxes and fees on firearms vendors are not relevantly similar to the Final Rule.

The Final Rule and its redefinition of "rifle" that purports to grant ATF the authority to regulate constitutionally protected pistols in an ahistorical manner violate the Second Amendment.

### 2. The Final Rule Violates The Constitution's Structural Protections.

The Final Rule also violates the Constitution's structural protections. Article I of the Constitution grants Congress the sole authority to craft legislation and create law. *See* U.S. CONST. Art. I, § 1. On the other hand, the President, and by extension the Executive Branch departments, "shall take Care that the Laws be faithfully executed." U.S. CONST. Art. II, § 3. "In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952). This separation of powers is "a basic principle of our constitutional scheme" under which "one branch of the Government may not intrude upon the central prerogatives of another." *Loving v. United States*, 517 U.S. 748, 757 (1996). To that

end, the Supreme Court has repeatedly "reaffirmed[ed] the core administrative-law principle that an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014).

This limitation means agencies "cannot manufacture statutory ambiguity with semantics to enlarge their congressionally mandated border." *Tex. Pipeline Ass'n v. FERC*, 661 F.3d 258, 264 (5th Cir. 2011). If agencies are given authority to create a legislative rule, that authority requires "a *clear delegation*" from Congress. *West Virginia v. EPA*, 597 U.S. 697, 735 (2022) (emphasis added). That is precisely what has happened here: As demonstrated above, the Agencies exceeded their statutory authority in redefining "rifle" when promulgating the Final Rule.

The Final Rule is also constitutionally infirm because it carries the possibility of criminal penalties. "[B]ecause of the seriousness of criminal penalties, and because criminal punishment usually represents the moral condemnation of the community, legislatures … should define criminal activity." *United States v. Bass*, 404 U.S. 336, 348 (1971). "[T]he question of Congress's delegating legislative power to the Executive in the context of criminal statutes raises serious constitutional concerns." *Cargill*, 57 F.4th at 472. And when a statute imposes criminal liability, fundamental principles of statutory interpretation, along with due process and separation of powers concerns driving the rule of lenity, forbid the Agencies' efforts

42

to broaden the definition of "firearm" or "rifle" while ignoring the definition of "handgun" and the common meaning of "pistol or revolver," even if this Court were to conclude that the definitions of "firearm" or "rifle" were ambiguous enough to include a braced pistol. *Id.* at 469–71.

In short, the Final Rule exceeds executive authority and violates the Delegation Doctrine and the Take Care Clause.

## IV.   The District Court's Vacatur Of The Final Rule Was Proper.

Vacatur of a regulation under the APA is reviewed for abuse of discretion. *Deanda*, 96 F.4th at 755. The district court did not abuse its discretion here.

### A.   The Anti-Injunction Act Does Not Apply To This Suit.

The Agencies argue that vacatur of the Final Rule is barred by the AIA. Br. 39–43. Because the NFA imposes a $200 tax on covered firearms, the theory goes, this suit is covered by the AIA since Plaintiffs' challenge will prevent ATF from collecting NFA taxes on SBRs covered by the Final Rule. This argument is circular, in that it assumes the Agencies are correct that the arms at issue are properly covered under the NFA and therefore subject to its tax. As the district court concluded, however, the firearms that would have been regulated by the Final Rule are outside of the NFA's taxation regime *ab initio*.

Moreover, the AIA "does not reach 'all disputes tangentially related to taxes.'" *Korte v. Sebelius*, 735 F.3d 654, 670 (7th Cir. 2013) (citation omitted). This

analysis turns on "the 'primary purpose' of [a] lawsuit," and the AIA will not bar a suit that has only an "incidental" effect on taxes. *Pendleton v. Heard*, 824 F.2d 448, 451 (5th Cir. 1987) (citation omitted). The "purpose" of a lawsuit is measured by "the claims brought and injuries alleged," with particular attention to "the 'relief requested.'" *CIC Servs., LLC v. IRS*, 593 U.S. 209, 217–18 (2021). The AIA does not apply here.

1.    First, the Final Rule repeatedly states that ATF exercised its "enforcement discretion" to *not* collect NFA-related taxes on covered firearms. 88 Fed. Reg. 6,508, 6,571; *see also id.* at 6,550; 6,553; 6,563; 6,568–69. Given this, vacatur cannot interfere with the Agencies' ability to assess and collect this tax. When this case was filed, it could not have been brought "for the purpose of restraining the assessment or collection of any tax." 26 U.S.C. § 7421(a). And the usual "pay now, sue later" approach does not apply to individuals such Plaintiffs Mock and Lewis—who simply possess braced pistols—because the tax is imposed against a *transferor* and not an existing owner. *See* 26 U.S.C. § 5811(b).

2.    Even if that were not so, the AIA does not apply because this is not a dispute about taxes. Plaintiffs contest the legality of the Final Rule under the APA, and the principal relief requested is "[h]olding unlawful and setting aside the Final Rule," "[v]acatur of the Final Rule," and "enjoining Defendants from enforcing and/or implementing the Final Rule." ROA.214. The Prayer does not ask the Court

to prevent the Agencies from collecting taxes, but rather to declare that the items at issue are not subject to the NFA's tax simply because the Agencies say so.

The Supreme Court's analysis in *Direct Marketing Ass'n v. Brohl*, 575 U.S. 1 (2015), demonstrates why the AIA does not apply. There, the Court allowed plaintiffs to challenge a Colorado statute imposing a duty on out-of-state retailers to report untaxed sales to Colorado residents so that state regulators could then collect a tax. It reasoned that the Tax Injunction Act ("TIA")[12] is directed at "the acts of assessment, levy, and collection themselves, and enforcement of the notice and reporting requirements is none of these." 575 U.S. at 12. As a result, plaintiffs' challenge to ordinary reporting duties requirements was not prohibited, even though those statutory requirements would "facilitate collection of taxes." *Id.*

This challenge is likewise removed from "acts of assessment [and] collection." The fact that "information gathering" associated with NFA registration of braced pistols might "facilitate collection of taxes" does not trigger application of the AIA. *Direct Marketing*, 575 U.S. at 8, 12.

*CIC Services* bolsters this conclusion. Plaintiffs there brought an APA challenge to an IRS notice imposing an information-reporting requirement backed by tax- and criminal-penalties. 593 U.S. at 211, 212–15. The IRS claimed the AIA

---

[12] The Supreme Court construes the TIA and AIA harmoniously. *Direct Marketing*, 575 U.S. at 8.

applied because an injunction would prevent it from assessing tax penalties. *Id.* at 215. The Supreme Court disagreed and emphasized that the AIA's "limit on injunctions … is 'not keyed to all activities that may improve [the government's] ability to assess and collect taxes,'" but "is instead 'keyed to the acts of assessment [and] collection themselves.'" 593 U.S. at 217 (citation omitted).

Here, as in *CIC Services*, Plaintiffs target the legality of an administrative rule that imposes costs and obligations that are "separate and apart from" and "exceed, or even dwarf" the tax imposed by the broader regulatory scheme. 593 U.S. at 220. Specifically, the Final Rule requires owners of stabilizing braces and braced pistols to either modify or destroy their firearms. 88 Fed. Reg. 6,570. The $200 tax comes into play only as part of the NFA's registration regime. The lawsuit's purpose is not to avoid the NFA's tax, but to challenge the Agencies' effort to reclassify firearms in the first instance. Any impact on the tax would be "the suit's after-effect, not its substance." *CIC Services*, 593 U.S. at 220.

Moreover, violation of the Final Rule subjects the Individual Plaintiffs and the entire regulated community to criminal penalties that provide no practical option for them to pay the transfer tax now and sue later. *CIC Services*, 593 U.S. at 222; *see* 26 U.S.C. §§ 5871, 5872 (NFA violations punishable by up to ten-year prison term or fine up to $10,000). These penalties are independent of the transfer tax's

assessment and collection. *See* 26 U.S.C. § 5861(b), (c), (d), (f), (j) (unlawful to receive, possess, or make a firearm that does not comply with the NFA).

3.    The Agencies claim that the district court erred in failing to "cabin its vacatur to non-tax contexts," Br. 41, thus suggesting that ATF should remain free to "apply[] the Rule" in tax "contexts." They cite no authority for continuing to apply a regulation that violates the APA. And in any event, vacatur does not impact the Agencies from making "tax determinations," Br. 41, for any arms properly within the NFA's scope.

The Agencies next argue (Br. 42) that the district court mistakenly decided that, because it vacated the rule and did not enjoin it, the AIA argument was moot. ROA.1951. The Agencies claim that vacatur operates just like an injunction since the AIA bars suits brought "for the purpose of restraining the assessment or collection of any tax." 26 U.S.C. § 7421(a). Plaintiffs need not unpack this argument, however, since vacating the rule does not trigger the AIA for the many reasons discussed above. Just as plaintiffs in *CIC Services* sought to "set[] aside" an IRS notice and have it declared unlawful under the APA—in addition to having it enjoined—vacatur (or setting aside) of the Final Rule does not trigger the AIA. 593 U.S. at 219. Indeed, the Agencies' argument ignores the fact that there are "meaningful differences" between injunctions and the "less drastic remedy" of vacatur. *Texas v. United States*, 40 F.4th 205, 219 (5th Cir. 2022).

In sum, the AIA has no application here.

**B.    Vacatur Is The Appropriate Remedy Under The APA And The Default Rule In This Circuit.**

Because the Final Rule violates the APA, the district court did not abuse its discretion by vacating it. "The default rule is that vacatur is the appropriate remedy" for unlawful agency action. *Data Mktg. P'ship, LP*, 45 F.4th at 859. Indeed, "[v]acatur is the *only* statutorily prescribed remedy for a successful APA challenge to a regulation." *Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 374–75 (5th Cir. 2022) (emphasis added).[13] As this Circuit recently summarized, "setting aside agency action under § 706 has 'nationwide effect,' is 'not party-restricted,' and 'affects persons in all judicial districts equally.' That is because, unlike an injunction, which operates *in personam*, vacatur operates on the status of agency action in the abstract." *Braidwood*, 104 F.4th at 951 (citations omitted).

**1.    This Is Not A "Rare" Case Where Departure From The "Default" Rule Of Vacatur Is Justified.**

This Circuit has explained that "[d]eparting from that default rule [of vacatur] is justifiable only in 'rare cases' satisfying two conditions," neither of which exists here. *Chamber of Commerce of United States v. SEC*, 88 F.4th 1115, 1118 (5th Cir. 2023) (citations omitted).

---

[13] While the Agencies question whether vacatur is authorized under the APA, Br. 44, a legion of this Circuit's cases confirm vacatur is not authorized, but the default remedy.

First, there is no "'serious possibility' that the agency will be able to correct the rule's defects on remand." *Id*. The flaws in the Final Rule cannot be remedied by further agency consideration. *See Texas v. United States*, 50 F.4th at 529. The Agencies have never explained how the Final Rule's defects could be corrected.

Second, vacating the Final Rule "would [not] produce 'disruptive consequences.'" *Chamber of Commerce*, 88 F.4th at 1118 (citation omitted). Rather, it would return the regulated community to the *status quo ante* regarding what constitutes a "rifle"—which has already been held in place, in part, by various injunctions. *Cf. Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 519 (D.C. Cir. 2020) ("[A] quintessential disruptive consequence arises when an agency cannot easily unravel a past transaction in order to impose a new outcome[.]"). The Agencies plea for remand in the name of regulatory clarity to avoid "confusion," Br. 49, 52, yet confusion would be guaranteed by a ruling that the Final Rule is invalid but should remain in place. In short, "[t]his is not a case in which the 'egg has been scrambled,' and it is too late to reverse course." *Allina Health Servs.*, 746 F.3d at 1110–11 (citation omitted).

The district court correctly held that this is not a "rare" case within the exception.

### 2. Equitable Principles Confirm That Vacatur Is The Appropriate Remedy.

The Agencies nevertheless claim that "equitable principles" support limiting relief to the named Plaintiffs. Br. 45–47. Not so. This Circuit's "precedent [does not] require consideration of the various equities at stake before determining whether a party is entitled to vacatur." *Braidwood*, 104 F.4th at 952.

Indeed, the Agencies' plea for party-specific relief is inconsistent with the APA's design. In APA cases, "the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (cleaned up). However phrased, the net result is that "set[ting] aside" unlawful agency action through vacatur wipes it from the books. One D.C. District court decision highlights the oddity of the limited vacatur proposed here:

> [T]he Court [is] at a loss to understand what it would mean to vacate a regulation, but only as applied to the parties before the Court. As a practical matter, for example, how could this Court vacate the Rule with respect to the organizational plaintiffs in this case without vacating the Rule writ large? What would it mean to "vacate" a rule as to some but not other members of the public? What would appear in the Code of Federal Regulations? Fortunately, the Court need not engage in such logical gymnastics because the language of the APA and the controlling D.C. Circuit precedent are unambiguous. … [T]he proper remedy is to set the Rule aside, and the legal consequences of that result are not limited "to the individual" plaintiffs.

*O.A. v. Trump*, 404 F. Supp. 3d 109, 153 (D.D.C. 2019).

Justice Kavanaugh explained in *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, how party-limited relief has no place under the APA. "The meaning of 'set aside' in the APA cannot reasonably depend on the specific party before the court." 144 S. Ct. 2440, 2469 (2024) (Kavanaugh, J., concurring). By authorizing vacatur, Congress has "depart[ed] from th[e] baseline" rule that "equitable relief is ordinarily limited to the parties in a specific case." *Id.* at 2467; *see also Kiakombua v. Wolf*, 498 F. Supp. 3d 1, 52 (D.D.C. 2020) (Jackson, J.) (explaining that party-limited relief "has no grounding in the Article III doctrine or in any federal statute of which this Court is aware").[14] Thus, Congress' explicit directive in the APA empowering courts to "hold unlawful and set aside agency action" overcomes the background rule that "traditional principles of equity" govern the scope of available relief. *See* Br. 45 (quoting *Starbucks Corp. v. McKinney*, 144 S. Ct. 1570, 1576 (2024)).

Additional considerations show that vacatur was appropriate:

*First*, universal relief was and is necessary given the nationwide scope of the Agencies' overreach, the nationwide scope of the Plaintiffs' operations, and the integrated nature of the firearms market.

---

[14] The Agencies' reliance on *Cargill* to seek a remedy short of vacatur, Br. 46, is unavailing. In contrast to these proceedings, the parties in *Cargill* "ha[d] not briefed the remedial-scope question," so the Court remanded the case for consideration of whether "a more limited remedy is appropriate." 57 F.4th at 472.

*Second*, universal relief ensures predictability and stability by maintaining the regulatory status quo. Nationwide relief serves the Agencies' claimed interest in regulatory consistency: Piecemeal adjudication—and, therefore, piecemeal enforcement—of the Final Rule's legality "would invite chaos." *District of Columbia v. USDA*, 444 F. Supp. 3d 1, 52 (D.D.C. 2020); *see also Feds. For Med. Freedom v. Biden*, 63 F.4th 366, 388 (5th Cir. 2023) ("piecemeal enforcement" would "undermine[] rather than support[] the Government's purported interest in" regulatory consistency).

*Third*, general equitable principles cut in favor of vacating the Final Rule in its entirety when, as here, it is unlawful. "It is of highest public importance that federal agencies follow the law." *R.J. Reynolds Vapor Co.*, 65 F.4th at 195; *see also Texas v. United States*, 40 F.4th at 229 (noting the "substantial public interest in having governmental agencies abide by the federal laws that govern their existence" (cleaned up)).

### 3.    Vacatur Appropriately Provides Relief To All Of FPC's Members.

The Agencies' last gasp is to protest that vacatur is unfair because it reaches all FPC members throughout the Nation instead of just the Individual Plaintiffs. Br. 50–51. The only basis cited for this extraordinary ploy is *Friends of the Earth, Inc. v. Chevron Chem. Co.*, 129 F.3d 826 (5th Cir. 1997), which the Agencies say requires an organization to produce "indicia of membership" establishing that it is a

"bona fide" membership organization that has authority to sue on its members' behalf. Br. 50. At bottom, the Agencies claim that "organizational plaintiffs may not purport to litigate on behalf of all their many unidentified members." Br. 51.

This argument further demonstrates the Agencies' misunderstanding of vacatur, which applies against the Final Rule in its entirety and not towards specific Plaintiffs. But the point of this unusual exercise seems to be casting doubt on FPC's legitimacy, since the Agencies' argument is premised on a misstatement of basic principles governing associational standing. *Friends of the Earth* does not impose the strict test the Agencies claim—it simply purported to apply the standard set by the Supreme Court in *Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977). That case holds that an organization has standing where "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id.*

But even if the Agencies accurately characterized *Friends of the Earth*, it does not control. The Supreme Court recently rejected an argument—functionally identical to the Agencies' claim here—relying on stray language in *Hunt* to challenge associational standing based on a claim that a plaintiff was "not a 'genuine' membership organization." *Students for Fair Admissions, Inc. v. President*

*& Fellows of Harvard Coll.*, 600 U.S. 181, 199–201 (2023). The Court explained that "[t]he indicia of membership analysis employed in *Hunt* has no applicability" in cases involving a "voluntary membership organization with identifiable members." *Id.* at 201. "Where … an organization has identified members and represents them in good faith, our cases do not require further scrutiny into how the organization operates." *Id.*

Such is the case here. There is substantial evidence confirming FPC's standing to pursue relief on behalf of its members, which include the Individual Plaintiffs and Maxim Defense. ROA.345-348, 349, 354, 357; *see* ROA.968-990.

## V.    If The Court Rejects Plaintiffs' APA Challenge To The Final Rule, Then The Final Rule And The NFA's Regulation Of SBRs Violate The Second Amendment.

Alternatively, if this Court allows the Final Rule to stand, then the NFA's regulation of SBRs is thus unconstitutional given it regulates commonly owned and possessed—and constitutionally protected—arms (whether referred to as braced pistols or short-barreled rifles) more stringently than the text and history of the Second Amendment allows. As demonstrated above, the required historical work has already been done here. In *Heller*, the Supreme Court established that the Second Amendment protects the right to "keep and bear" "those [Arms] 'in common use at the time.'" 554 U.S. at 627. "That limitation is fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Id*. This

Court's task is therefore a simple one: it must merely determine whether these weapons are "dangerous and unusual." "[T]his is a conjunctive test: A weapon may not be banned unless it is *both* dangerous *and* unusual." *Caetano*, 577 U.S. at 417 (Alito, J., concurring).

A firearm that is in common use for lawful purposes does not fall within this category and cannot be regulated outside of the historical scope of regulation allowable under the Second Amendment. As of 2012, "[h]undreds of thousands of Tasers and stun guns ha[d] been sold to private citizens" who "may lawfully possess them in 45 States." *Caetano*, 577 U.S. at 420 (Alito, J., concurring) (citation omitted). Those hundreds of thousands of stun guns were deemed by Justice Alito to constitute "in common use" in *Caetano*. If the Agencies are correct and braced pistols are actually SBRs, then, based on the Agencies' own estimate, there are at least 3 million more short-barreled rifles that are owned by law-abiding individuals for lawful purposes. *See* Final Rule at 6,560. This is in addition to the (at least) 532,725 registered short-barreled rifles possessed throughout the country as of May 2021. ATF, *Firearms Commerce in the United States – Annual Statistical Update 2021*, 15–17 Ex. 8, https://www.atf.gov/firearms/docs/report/2021-firearms-commerce-report. Just as hundreds of thousands of stun guns constituted "common use" in *Caetano*, millions of braced pistols or short-barreled rifles establishes "common use" here. Notably, the Agencies do not dispute comments that there are

55

"millions of 'braces' in use[,]"or that braced pistols are "commonly used by millions of law-abiding Americans for various reasons." Final Rule at 6,556.

Accordingly, the Agencies bear the burden to demonstrate that the NFA's laws and regulations are consistent with the Nation's historical tradition of firearm regulation. But here, the Agencies cannot meet their burden for all of the reasons demonstrated above. Accordingly, if this Court upholds the Final Rule, then this Court should declare that the NFA's regulation of SBRs is unconstitutional and enjoin Defendants from enforcing the NFA's provisions as to SBRs.

## CONCLUSION

For all these reasons, the Court should affirm the district court's judgment and vacatur of the Final Rule.

Respectfully submitted,

s/ Bradley A. Benbrook

R. Brent Cooper
COOPER & SCULLY PC

Bradley A. Benbrook
  *Counsel of Record*
Stephen M. Duvernay
BENBROOK LAW GROUP, P.C.

Cody J. Wisniewski
FPC ACTION FOUNDATION

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF SERVICE

Pursuant to Fed. R. App. P. 25(d) and 5th Cir. R. 25.2.5, I hereby certify that on November 6, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system, which will accomplish service on counsel for all parties through the Court's electronic filing system.

s/ Bradley A. Benbrook_
Bradley A. Benbrook

# CERTIFICATE OF COMPLIANCE

1.     This brief complies with the length limits permitted by Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,987 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.     This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and 5th Cir. R. 32.1 and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

3.     Additionally, I certify that (1) any required redactions have been made in compliance with 5th Cir. R. 25.2.13; and (2) the document has been scanned with the most recent version of Avast Security virus detector and is free of viruses.

Dated: November 6, 2024

s/ Bradley A. Benbrook
Bradley A. Benbrook